**ALNA CAPITAL ASSOCIATES, etc., Plaintiff,**

v.

**William WAGNER, Defendant.**

**No. 74–1699–CIV–EPS.**

United States District Court, S. D. Florida, Miami Division.

Feb. 3, 1982.

Daniel Heller, Miami, Fla., for plaintiff.

Bernard Mandler, Miami, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM OPINION THEREON

SPELLMAN, District Judge.

This securities fraud action is brought under § 10(b) of the Exchange Act of 1934, § 517.301 of the Florida Statutes, and Florida common law. Jurisdiction over the Rule 10b5 claim is based on Title 28 U.S.C. § 1331. The Court has heard the state claims on the basis of pendent jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

The Plaintiff, ALNA CAPITAL ASSOCIATES, is a limited partnership of which Albert Nahmad is the general partner. The only asset of the partnership is its stock in Watsco, Inc. Alna Capital Associates succeeded Alna Capital, Inc., a closely held

corporation composed of the same investors as in Alna Capital Associates. Albert Nahmad was the president of the corporation and its only asset was the stock owned later by Alna Capital Associates. Albert Nahmad spearheaded the organization of both Alna Capital Associates and Alna Capital, Inc. for the purpose of buying a 38% block of the outstanding shares of Watsco, Inc. on December 29, 1972 from the defendant, WILLIAM WAGNER. William Wagner was president and chairman of the board of directors of Watsco, Inc. at the time of the stock sale.

The Plaintiff alleges that the Defendant Wagner fraudulently misrepresented material information and withheld material information which he had an obligation to disclose in connection with the sale to Nahmad and his associates of 300,000 shares of Wagner's personally-held stock in Watsco.

The alleged misrepresentations and omissions can be grouped into three categories: (1) Financial reports—misstatements in the public financial reports of Watsco; (2) Winslow—misstatements and omissions with regard to contracts entered into by the Winslow division of Watsco; and (3) Chargefaster—misstatements and omissions concerning the operation and patent status of "Chargefaster", a refrigeration product manufactured by Watsco.

Although the testimony was conflicting on many of the issues in this case, hereinafter set forth are the facts as the Court finds them in light of all the evidence submitted and considering the credibility of the witnesses.

The time frame of the allegedly actionable conduct was from August of 1972 until December 29, 1972. The events unfolded as follows. Albert Nahmad, a mechanical engineer with a Bachelor of Science degree from the University of New Mexico and a Master of Science degree in Industrial Administration from Purdue University, had been employed for several years by the accounting firm of Arthur Young and Company (hereafter "Arthur Young") in Indianapolis, Indiana. Subsequent to leaving Arthur Young, Nahmad went to New York City where he worked in the corporate acquisition department of W. R. Grace and Co. Nahmad left his job with W. R. Grace in 1971 and set about the task of finding a small manufacturing company to invest in and possibly manage. At the same time, William Wagner, the president of Watsco, was interested in selling his shares in the company and he hired brokers to effect a sale. One broker, Ted Murnick, contacted a Mr. Weiner, who in turn contacted his friend Albert Nahmad. Nahmad looked at Watsco financial reports and then decided to come to Hialeah, Florida to examine the Watsco business and speak to Wagner.

Nahmad spent three days with Wagner at the Watsco plant in August, 1972. Wagner asked $10.00 per share and Nahmad made a counteroffer of $8.50 per share. Wagner stated that he wanted a price of 15 times earnings while Nahmad suggested 12 times earnings. During the course of the meetings, Wagner had stated that Watsco's earnings for the year would be 70 cents per share.

Wagner also gave Nahmad a detailed description of Chargefaster, including the claim that the product transformed liquid refrigerant into saturated vapor, making it almost impossible for liquid to reach and damage the compressor of a cooling unit. Wagner explained that the marketing of Chargefaster had just begun and that a high profit margin would continue on the product because a patent would be obtained for Chargefaster.

Wagner described to Nahmad the marketing of the products manufactured by the Winslow division of Watsco, indicating that Winslow had oral wholesaling agreements.

After the meetings, Nahmad returned to New York. A few days later, a deal was agreed to by Nahmad and Wagner over the telephone whereby Nahmad and his associates would buy 300,000 shares from Wagner at $8.50 per share. Wagner's attorney, Carmen Accordino, prepared a draft agreement and sent it to Nahmad's attorney Michael Zuckerman in New York.

On September 26, 1972, an option agreement was signed by Nahmad and Wagner. Nahmad then hired Arthur Young & Co. in Miami, Florida to investigate and analyze the Watsco business as part of a pre-acquisition review, which that company undertook. Although the option agreement provided that Nahmad could request a physical inventory at his own expense, no such inventory was taken.

In October, Wagner and Nahmad discussed past litigation over Winslow distributorship agreements. Wagner did not mention the antitrust lawsuit filed by Clarence Firstenberg in Los Angeles or any other potential antitrust problems with Winslow's contracts.

Also in October, Wagner received a rejection from the United States Patent Office on his patent application for Chargefaster which was not communicated to Nahmad until long after the final closing.

As a result of the Arthur Young pre-acquisition review, Nahmad developed serious concerns about several matters, one of which was the inventory of Watsco, leading him to believe that the yearly profits of Watsco would be 64 cents instead of the projected 70 cents. Nahmad met with Wagner and informed him of his concerns about the inventory. Wagner reassured Nahmad that the inventory was fine, but Wagner did agree to lower the price per share to $8.00. As part of the renegotiation, Wagner's liability for a drop in shareholders' equity was reduced. Wagner also insisted that it was absolutely essential that the sale close by the end of the calendar year 1972.

Just prior to the signing of the November 27th agreement of sale, Watsco announced profits of 59 cents per share for the first three quarters of the fiscal year ending January 31, 1973. The November 27th agreement provided for Wagner to sell to Nahmad 300,000 shares of Watsco stock, which stock was registered and traded on the American Stock Exchange, for $8.00 per share. The contract provided for an initial cash payment of $700,000.00 plus 12 quarterly payments of approximately $141,666.00 plus 6% interest.

Section 3.16 of the contract provides that copies of all agreements to which Watsco was a party were attached to the contract of sale. Section 3.23 states that no amendments or terminations of agreements entered into by the company had occurred save those enumerated in Schedule E of the contract.

The sale closed on December 29, 1972. At the time of closing, Wagner was aware of Alna Capital, Inc., which was composed of Nahmad's associates.

Subsequent to closing, in early 1973, Arthur Young prepared the annual financial statement of Watsco. Arthur Young's initial version of the statement showed a 4th quarter loss of 9 cents per share, from 59 cents to 50 cents. The loss was occasioned by a combination of factors: a drop in the value of inventory due to obsolescence and shortages; a drop in the value of accounts receivable; and a recognition of a loss to Watsco in a "lease" transaction with Advanced Plastics Corporation. Arthur Young evaluated the striking change in the financial status of Watsco and determined that a restatement of the prior three quarterly reports was necessary to accurately reflect the financial condition of Watsco. Under the restatement, the quarterly earnings per share figures changed from

| 1st Q – 17 cents | | 1st Q – 13 cents |
| 2nd Q – 48 cents | to | 2nd Q – 37 cents |
| 3rd Q – 59 cents | | 3rd Q – 45 cents |

leaving the fourth quarter with 5 cents earnings per share.

Paul Manley of Arthur Young explained the restatement and its basis to the Defendant William Wagner at a meeting between the two. Wagner listened to the explanation by Manley and made no comment as to the significancy or accuracy of the restatement.

The restatement was approved by the Watsco board of directors and was filed with the Securities Exchange Commission. With the public announcement of the restatement, the value of the market shares dropped from approximately $8.00 to approximately $4.00.

In the spring or summer of 1973, Nahmad became aware of written exclusive distributorship agreements between Watsco and the distributors of the Winslow hair spray products. Previously, Nahmad had been informed that Watsco merely had oral agreements with Winslow wholesalers. The undisclosed Winslow agreements had the effect of tying up the major national markets for distribution of Winslow products. In the summer of 1974, legal counsel to Watsco informed Nahmad that the Winslow distributorship agreements entailed serious antitrust problems.

Later in 1974, Nahmad became aware of certain problems relating to Chargefaster. Watsco had obtained a patent on Chargefaster in 1973 based on Wagner's renewed patent application, in which he claimed that the product converted all (100%) of liquid refrigerant into saturated vapor before it entered a cooling unit. Wagner had not yet informed Nahmad of the October, 1972 patent rejection or of its contents which stated that at least four other persons had previously produced devices capable of doing that which Chargefaster does.

When Wagner informed Nahmad that another manufacturer was infringing the Watsco Chargefaster patent, the company filed suit. The suit was subsequently dropped, partially on the basis of Wagner's advice. Subsequently, on advice of counsel and after the 1972 patent rejection became known to Nahmad, the Chargefaster patent was withdrawn by Watsco. Profits from Chargefaster had declined substantially since its first full year of sales.

In December of 1974, the present lawsuit was filed.

The complaint herein is founded on § 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j, on the Florida statutory version of Rule 10b5, F.S. § 517.301, and on Florida common law of fraud. 15 U.S.C. § 78j(b) reads as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
. . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b5 reads as follows:

## EMPLOYMENT OF MANIPULATIVE AND DECEPTIVE DEVICES

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Florida Statute § 517.301, practically identical to the substantive prohibitions of Rule 10b5, differs only in reaching securities transactions which have no interstate connection.

Although the Florida Statute is basically identical to Rule 10b5, the courts have interpreted the two provisions differently in two important regards. Both Statutes require proof of (1) a misrepresentation or omission, (2) of information that is material to the sale transaction, and (3) where the purchaser relied on such misrepresentation or omission. However, Rule 10b5 requires proof of fraudulent intent, knowledge, or reckless disregard of the falsity of the mis-

representation. In addition, a 10b5 case must be proven by clear and convincing evidence. F.S. § 517.301 has a less stringent scienter requirement, making negligent misrepresentations actionable. Also, there is no burden under Florida law to prove the claim by clear and convincing evidence. Punitive damages, which are unavailable under 10b5, may be obtained under Florida law.

Under Florida common law fraud, mere negligence satisfies the scienter requirement and the requirements are otherwise identical to those for F.S. § 517.301.

The first questions for the Court are whether any false representations were made by Wagner in connection with this sale of stock and whether Wagner failed to state information necessary in order to make other statements made not misleading. Of the three groups of alleged misrepresentations—financial statements, Winslow contracts, and Chargefaster—the first which attracted the attention of the Plaintiff was the financial statements category.

The Plaintiff contends that the quarterly earnings statements of Watsco, 8–K forms filed with the S.E.C., for the first three quarters of the fiscal year ending January 31, 1973, falsely inflated the earnings of Watsco by: (1) overvaluing obsolescent inventory, (2) overstating the cost of goods sold by failing to reflect inventory shortages, (3) overvaluing accounts receivable, and (4) failing to recognize the sale-loss effect of a "lease" transaction with Advanced Plastics Corporation.

In the 1973 Arthur Young & Co. accounting restatement of the quarterly 8–K financial reports originally filed in 1972, Watsco made substantial adjustments with regard to obsolescence, cost of goods sold, accounts receivable, and the Advanced Plastics lease.

On inventory obsolescence, Watsco wrote off for the fiscal year ending 1973 $52,-000.00. On the cost of goods sold, the Watsco-Arthur Young restatement reflected an inventory shortage of $126,000.00. On accounts receivable, the Watsco-Arthur Young restatement reflected a loss of $58,-000.00, attributed to the second quarter of the fiscal year.

It is indisputable that Wagner intended that Nahmad rely on the quarterly financial statements of the company. That intention is reflected in the contract of sale and in Wagner's announcement to Nahmad that Watsco had 59 cents earnings per share for the first three quarters of the year. Moreover, Wagner, as president and chairman of the board of directors of Watsco, and as the controlling force behind Watsco, is fairly held responsible for the unaudited quarterly financial statements, the 8–Ks. Thus, if there were misrepresentations in the 8–Ks, it is also the case that Wagner, by taking part in propounding the 8–Ks, may be said to have been misrepresenting the information to Nahmad.

The critical issue is whether the original 8–Ks were misrepresentations. This issue is not resolved merely by a determination that the Arthur Young restated quarterly reports accurately reflect the financial position of Watsco at those times. To the contrary, accounting is an inexact science and many times there may be more than one "accurate" statement of a company's financials. In fact, it would be unusual for two accounting firms to reach the exact same determination on a year-end audit.

Thus, it is not enough that the restatement is right; the original quarterlies must also be wrong. The testimony in this regard comes from Paul Manley of Arthur Young & Co. for the Plaintiff and from Warren Silverman for the Defendant.

Warren Silverman, a certified public accountant, testified that the three original quarterly reports Watsco filed in 1972 were prepared in accordance with generally accepted accounting principles. Silverman did not opine as to whether the dollar values for inventory obsolescence, cost of goods sold, or accounts receivable were factually correct under the original quarterlies, nor did he do so with regard to the dollar values in the restated quarterlies. Essentially, Silverman testified that the accounting for the inventory could adequately have been done either the original way or the

restated way. He offered no numbers portraying the true financial posture of Watsco at any point in time. Silverman disputed the Arthur Young audit of accounts receivable and of the Advanced Plastics transaction, but he offered no different figure with respect to accounts receivable. On the Advanced Plastics transaction, although he suggested that lease treatment was not inappropriate, he offered no reason why the loss incident to the transaction should not have been reflected in the second quarter in 1972. In addition, Silverman adopted the opinion of his former employer Stanley Cohen that he could not criticize Arthur Young for restating Watsco's financial statements.

The testimony of Paul Manley, the vice president in charge of the Miami office of Arthur Young & Co., was highly persuasive. The reasoning employed by Arthur Young and the conservative approach taken in the restatement lead the Court to accept as correct the financial figures reflected in the restated Watsco quarterly reports. Moreover, the evidence clearly indicates that the original quarterly reports were inaccurate in their reflection of the cost of goods sold, accounts receivable, and the loss attributable to the Advanced Plastics transaction. The Court finds the evidence inconclusive on the issue of inventory obsolescence. Since the judgment of management is so critical in the determination of inventory obsolescence, especially given the invention-oriented nature of Watsco under Wagner, the Court cannot conclude that the inventory obsolescence figures for the quarterly reports were misrepresentations of material fact. However, the Court finds that the cost of goods sold, accounts receivable, and Advanced Plastics figures were misrepresentations.

The second set of alleged misrepresentations revolves around the distributorship agreements entered into between the Winslow division of Watsco and the various distributors of the hair spray products manufactured by Winslow. Albert Nahmad testified that Wagner stated to him during the pre-acquisition meetings that there were no written contracts with Winslow distributors and that there were merely oral agreements for wholesale distribution. Nahmad testified that no mention was made of territorial exclusivity restrictions, but that Wagner had said that the agreements were merely called franchises to encourage distributors' best efforts in promoting Winslow products. Further, Nahmad testified that Wagner made no mention of any provision in the Winslow agreements requiring that the distributors sell only Winslow products to their customers in order for service agreements to remain in force. Nahmad testified that Wagner failed to mention that a significant number of new Winslow distributorship agreements had been signed in the year prior to Nahmad's purchase, that the new contracts had a significant effect in improving Winslow's earnings picture, and that many of these new contracts had been cancelled.

Moreover, Nahmad testified that Wagner failed to inform Nahmad that Wagner felt Winslow was in a deteriorating condition and that Wagner had been trying to sell off that division of Watsco. Additionally, Nahmad testified that Wagner failed to comply with two provisions of the contract of sale: one requiring Wagner to attach to the contract all agreements to which Watsco was a party, and another requiring Wagner to attach all cancellations of contracts to which Watsco was a party.

Finally, Nahmad testified that there were serious antitrust problems with the Winslow agreements specifically failing to mention the lawsuit filed by Clarence Firstenberg in Los Angeles, which was eventually settled for a figure of $5,000.00.

The Court finds that all of these misrepresentations and omissions occurred. The evidence is uncontroverted on many of these points. On one, the question of whether Nahmad was informed that written Winslow contracts were in effect, there is a conflict in the evidence. However, the Court finds Nahmad's testimony much more credible than Wagner's on that point, especially given the undisputed fact that no Winslow contracts were turned over to

Nahmad as the terms of the contract provided.

■ The third and final set of alleged misrepresentations concerns Chargefaster. Nahmad testified that Wagner never mentioned that Wagner's patent application for Chargefaster was initially rejected on the grounds that the product was not novel and that at least four different inventors had previously produced equivalent products. The Plaintiff also offered substantial evidence that Wagner falsely represented that Chargefaster converts into saturated vapor all of liquid refrigerant used to recharge cooling units. The evidence demonstrated that not all liquid refrigerant was converted by Chargefaster and that the product did not perform as advertised by Watsco under Wagner.

The Court finds that Wagner misrepresented the operation of Chargefaster to Nahmad. The sales history of Chargefaster subsequent to its first full year of sales confirms that it was not the revolutionary product Wagner claimed it to be. The tests conducted in the courtroom showed that the product did not convert all liquid refrigerant to saturated vapor but merely converted some of the liquid refrigerant into partially saturated vapor. Thus, Wagner misrepresented the performance of Chargefaster not only to the U.S. Patent Office, but also to Nahmad. Also, the evidence clearly shows that Wagner failed to state to Nahmad that the U.S. Patent Office had initially rejected his application for a Chargefaster patent in October, 1972.

## MATERIALITY

■ The next pertinent inquiry with regard to the misrepresentations and omissions found by the Court is the question of materiality. The test of whether an omitted or misrepresented fact is material is whether a reasonable investor would have considered the fact important in deciding whether to invest. *S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968); *T.S.C. Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Mills v. The Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1969).

■ With regard to the financial misrepresentations, the answer is clear. The false quarterly reports substantially distorted the true earnings of Watsco. The Court heard substantial evidence indicating that earnings per share is an important fact to reasonable potential investors. Moreover, the very fact that false financial information had been published by Watsco is a material fact which a reasonable investor would have wanted to know. See *Drake v. Thor Power Tool Co.*, 282 F.Supp. 94 (D.C.Ill. 1967).

■ With regard to the Winslow misrepresentations and omissions, the question of materiality is more difficult. However, the Court need not consider the materiality of the Winslow situation without reference to the other misrepresentations and omissions made by Wagner, i.e., the financials and Chargefaster. All of the misrepresentations were made in connection with Wagner's sale to Nahmad of Watsco stock. In fact, most were made during Nahmad's three day meeting with Wagner in Hialeah. This is not to say that when one material misrepresentation had been made all other misrepresentations become material, but rather that given one set of very material misrepresentations, the threshold of materiality will likely drop for a second or third set of misrepresentations.

The absence of the Winslow contracts from the contract and the misrepresentations with regard to the nature of those contracts were material. Reasonable investors would consider important the marketing system of a major division of the corporation in which they are deciding whether or not to invest. Also, a reasonable investor would have considered important the sudden increase in both the number of new Winslow contracts and the number of cancellations of those same contracts. Thus, the misrepresentations of and failure to disclose Winslow contracts and cancellations were material.

Another difficult materiality question is presented by the undisclosed antitrust problems and concerns facing Winslow in 1972, specifically the problems dealt with in the undisclosed Firstenberg lawsuit. Presumably, Nahmad's attorney Zuckerman could have evaluated any antitrust problems with Winslow's distribution merely by examining the contracts which should have been turned over to Nahmad by Wagner. Hence, the fact that Wagner, a non-lawyer, did not come out and specifically address antitrust problems with Nahmad does not add much that would be important to a reasonable investor. However, the Firstenberg lawsuit, especially due to the expensive and thorough handling of the case by numerous attorneys for Wagner, was such a crystal clear demonstration of the potential and actual antitrust problems for Winslow that it would have added much of importance to a reasonable investor's decision. That non-disclosure was material.

The Chargefaster misrepresentations and omission were material. Chargefaster had become, almost overnight, a major contributor to the earnings of Watsco. It promised to continue to be profitable to the corporation if it could do what its inventor promised and could be patented. The non-disclosure of the patent rejection was thus highly material. Further, the misrepresentations as to the performance of the product were also material.

## RELIANCE

After materiality, the next essential element of the Plaintiff's causes of action is reliance. With regard to omissions, the Supreme Court has stated that in a Rule 10b5 case, where there is an obligation to disclose and the Defendant fails to make disclosure, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Under *T.S.C. Industries, Inc. v. Northway,*

*Inc., supra*, the last part of that test would likely be altered to "... in the sense that a reasonable investor *would* have considered them important ...."

*Simon v. Merrill, Lynch, Pierce, Fenner and Smith, Inc.*, 482 F.2d 880 (1973), gives weight to the proposition that the Plaintiff's "general reliance" on the non-disclosure by the Defendant must be shown in a 10b5 case. However, unlike the facts in *Affiliated Ute*, the claim in *Simon* did not arise out of a face to face transaction.

If general reliance is required for omissions in this face to face transaction, under the common law fraud, the Florida Blue Sky Law, or the 10b5 standards, it has been clearly demonstrated in the present case. Wagner was the ultimate source of information about Watsco. Nahmad evaluated and hired others to evaluate the business condition of Watsco, but he relied on Wagner's representations and omissions concerning Watsco.

With regard to misrepresentations, the reliance issue is whether or not the purchaser actually relied on the misrepresentations in deciding to purchase. Basically, the test is one of subjective materiality. Did the misrepresentations play a significant part in the decision to purchase? The test can also be viewed as one of causation in fact. Did the Defendant's misrepresentations induce or cause the Plaintiff to make his investment decision?

In this part of the case, a critical question to be asked in relation to each misrepresentation is: What did Nahmad know of the true facts and when did he know it?

Nahmad was aware prior to the November 27th agreement that there were serious problems with the quarterly financial statements of Watsco. The pre-acquisition review by Arthur Young alerted Nahmad to the faulty inventory control system of Watsco and the softness in accounts receivable, and gave him reason to question the validity of reported earnings and earnings projections. In fact, Nahmad renegotiated the contract of sale with Wagner due to his concern over the accuracy of the quarterly

earnings statements. The pre-acquisition review led Nahmad to believe Watsco earnings for the year would be 6 cents less than projected by Wagner. Nahmad discussed with Wagner his concerns about inventory, but Wagner insisted that the earnings figures were correct and that Watsco would not have filed false public earnings statements since that would open them to a wide range of liability.

Nahmad was less than completely convinced by Wagner's protestations, and a renegotiation of the contract was worked out providing for a reduction in the purchase price of 50 cents per share and a substantial reduction in Wagner's potential liability for a drop in shareholders' equity.

The only fair conclusion to draw from the facts is that Nahmad relied substantially on the quarterly financial statements, even though he had real doubts that the company would live up to its earnings projection. The facts also indicate that Nahmad relied on the claims Wagner made regarding the performance of Chargefaster, which was, at that time, a major profits producer for Watsco.

## SCIENTER

On the issue of scienter, the factual and legal questions become complex. Under the Florida common law claim, scienter may be satisfied by showing merely that the Defendant should have known that his misrepresentations were false. Otherwise stated, it is a mere negligence standard. *Kutner v. Kalish*, 173 So.2d 763, 765 (Fla. App.1965). That standard appears to be identical to the scienter requirement for violation of Florida Statute § 517.301. *Stowell v. Ted S. Finkel Investment Services, Inc.*, 489 F.Supp. 1209 (D.C.Fla.1980).

The scienter requirement for a violation of Rule 10b5 is much more stringent. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court stated:

When a statute speaks so specifically in terms of manipulation and deception, and of implementing devices and contrivances—the commonly understood terminology of intentional wrongdoing—and when its history reflects no more expansive intent, we are quite unwilling to extend the scope of the statute to negligent conduct.

In *G. A. Thompson and Co., Inc. v. Partridge*, 636 F.2d 945, 961 (5th Cir. 1981), the Court held that proof of severe recklessness is sufficient to prove scienter in a 10b5 action.

The facts showed that Wagner had controlled Watsco [the Wagner Tool and Supply Company] since its origin in 1945. He operated the business in New York until 1956 when he moved the company to Hialeah. At all times through December 29, 1972, Wagner was the president and chairman of the board of directors of Watsco. In 1972, Wagner was making an active effort to sell Watsco. He had hired a broker to accomplish the sale.

Wagner's complete control of Watsco was emphasized by the fact that his son and his son-in-law occupied important, executive positions in the company. Wagner handled the daily business of the company. He examined all mail coming to or leaving Watsco. He used an intercom monitoring system at the plant to keep track of operations.

Wagner was actively involved in the many corporate acquisitions by Watsco over the eleven years preceding the sale to Nahmad. He reviewed all the raw financial figures and processed that information before sending it to his accountants, Bromberg & Aronow. In terms of financial decision-making, he had rejected a cost system for evaluating inventory and there was evidence that he was personally involved in the decision to treat the Advanced Plastics transaction as a lease. He was aware of major problems in the system of inventory control. He had a clear understanding of the positive effect overstating inventory value has on reported earnings. He also understood that the sale price of a corporation's stock by reference to a multiple of repeated earnings was a common practice.

When Paul Manley of Arthur Young & Co. confronted Wagner with the financial

restatement and the reasons behind it, Wagner offered no explanation or contradiction. He merely acquiesced in the new figures.

Wagner admitted that he had direct knowledge of the Winslow contracts and the October, 1972 Chargefaster patent rejection. He knew of the Firstenberg antitrust litigation and of the Winslow contract cancellations. It must also be inferred from the facts that he understood that Chargefaster did not perform as promised.

Wagner was shown to have made several misstatements as a witness at the trial of this case. These include his denying recognition of his own handwriting on a memo concerning the deterioration of Winslow and on a paper where he had indicated the sale price of Watsco stock by reference to a multiple of earnings.

Under the standards enunciated in *G. A. Thompson and Co., Inc. v. Partridge, supra,* and *Huddleston v. Herman and MacLean,* 640 F.2d 534 (5th Cir. 1981), the Court finds that the scienter or fraud requirement has been satisfied by clear and convincing evidence. Conscious intent to defraud is obvious in the Winslow and Chargefaster misrepresentations. The accounting misrepresentations indicate that the Defendant must have known the true financial condition of the company. At a minimum, the monthly and quarterly financial statements were published with severe recklessness as to whether or not they were true.

The stringent 10b5 standard having been satisfied by the evidence in this case, the Court necessarily finds that the scienter requirements under the Florida Blue Sky Law and under common law fraud have been fully satisfied by the evidence.

### PLAINTIFF'S DILIGENCE

▇ The Defendant has raised the issue of due diligence by the Plaintiff. The diligence of the Plaintiff cannot be questioned except with regard to the Plaintiff's failure to take a physical inventory. The evidence on this point was mixed, but it certainly did not reflect any conscious avoidance of the truth. Nahmad testified that Wagner had objected to an inventory, claiming that it was unnecessary, although he had agreed to it and although Nahmad would foot the bill for employees counting the physical inventory. Wagner indicated to Nahmad that he did not want to close down the plant for an inventory and he assured Nahmad that the inventory was fine.

Other than failing to take an inventory, Nahmad cannot be criticized for lack of diligence. He invested considerable funds in a pre-acquisition review by Arthur Young and Co. He spent many hours looking over the plant and speaking to employees. He was diligent; he simply did not catch everything.

### "SECURITY"

▇ Near the end of the trial, the Defendant raised the issue of whether the sale of 38% of a corporation's publicly-traded stock, listed on the American Stock Exchange, is a sale of a security under Rule 10b5. The Court answers this question in the affirmative and finds no need to apply the *Frederiksen v. Poloway,* 637 F.2d 1147 (7th Cir. 1981) test of whether the purchaser is putting his "money in the hands of another who will control the funds and the business decision." 637 F.2d at 1148. The Court finds that the prohibition of fraudulent securities transactions must apply to large purchases as well as small purchases. Moreover, the limitation of the concept of a security advocated by the Defendant is contrary to common sense and normal expectations. The transaction in the present case involved securities. See *Hooper v. Mountain States Securities Corporation,* 282 F.2d 195 (5th Cir. 1960); *A. T. Brod & Co. v. Perlow,* 375 F.2d 393, 396 (2d Cir. 1967); *Coffin v. Polishing Machines, Inc.,* 596 F.2d 1202, 1204 (4th Cir. 1979).

### DAMAGES

▇ The Court has found that the Plaintiff has sustained his burden of proving by clear and convincing evidence the Rule 10b5 claim. The Court has also found that the Plaintiff has met the less demand-

ing burdens of proving his claim under Florida Statute § 517.301 and the Florida common law of fraud. The Plaintiff has been damaged as a proximate result of the Defendant's actions.

On the question of damages, the Plaintiff has withdrawn its original prayer for relief in the form of rescission and now seeks only actual damages for its out-of-pocket loss as well as punitive damages for Wagner's fraudulent actions.

The sale price of the stock was $8.00 per share. The question for the Court is to determine what was the fair market value, absent the misrepresentations, of the shares at the time of sale. *Huddleston v. Herman and MacLean, supra.* The sale price was apparently reached by using a multiple of 12 times the projected yearly earnings of approximately 65 cents per share. The actual reported earnings for the year were 50 cents per share. However, actual reported earnings would have been 53 cents if the prior inventory obsolescence figures had been maintained. The Court has already determined that the prior obsolescence figure was not a misrepresentation. The figure of 53 cents is the one of importance in calculating damages. The difference between 65 and 53 cents, 12 cents, multiplied by 12 is $1.44 per share, bringing the value of the shares down to $6.56. However, knowledge of the true state of affairs regarding Winslow and Chargefaster would have been likely to reduce the fair market value of the shares by an additional 72 cents, or 6 cents multiplied by 12, bringing the fair market value of the shares to $5.84 per share.

The Court is informed in its judgment by the testimony of Theodore Gould, the Plaintiff's expert on securities values. Although the Court finds much of his testimony persuasive, his choice of an earnings multiple was too low. The earnings multiple of 12 which Nahmad and Wagner agreed upon is reasonable, even given the fact of lowered earnings.

300,000 shares at $5.84 per share is $1,752,000.00. Plaintiff has already paid Wagner $1,974,994.00. Thus, the Plaintiff is entitled to actual damages of $222,994.00 as well as a declaration that he not be required to make any further payments to Wagner.

### PUNITIVE DAMAGES

Under both Florida and federal law, the decision whether to award punitive damages rests within the discretion of the jury or of the trial court sitting without a jury, since the degree of punishment to be inflicted must always be dependent on the circumstances of each case, as well as on the demonstrated degree of malice, wantonness, oppression or outrage found from the evidence. 17 Fla.Jur. § 112, Damages; *Joab, Inc. v. Thrall*, 245 So.2d 291 (1971, Fla.App. D3); *Precision Plating and Metal Finishing, Inc. v. Martin-Marietta Corp.*, 435 F.2d 1262 (5th Cir. 1970) cert. denied 404 U.S. 1002, 92 S.Ct. 571, 30 L.Ed.2d 556.

The Court has considered all the evidence and finds that the Defendant's conduct was not so outrageous as to justify the imposition of punitive damages.

The Plaintiffs are hereby directed and ordered to file with this Court within fifteen (15) days from the date of this Order a proposed Final Judgment in accordance with this Order.