SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

George J. COATES, individually and d/b/a Coates Precision Engineering, Ltd., Coates Enterprises, Ltd., Coates International Licensing Ltd., and George J. Coates 1991 Family Partnership, L.P., and Coates International, Ltd., Defendants.

No. 94 Civ. 5361(CBM).

United States District Court, S.D. New York.

April 6, 2001.

George N. Stepaniuk, Securities and Exchange Commission, Northeast Regional Office, New York City, for Plaintiff.

William J. Wolf, Bathgate, Wegener & Wolf, P.C., Lakewood, NJ, for Defendants.

### OPINION AND ORDER

MOTLEY, District Judge.

In this securities fraud action brought under the Securities Act of 1933 ("the Securities Act") and the Securities Exchange Act of 1934 ("the Exchange Act"), the Securities and Exchange Commission ("the Commission" or "the SEC") brings this motion for summary judgment seeking (i) a finding that George J. Coates ("Coates") violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 U.S.C. § 240.10b–5, and (ii) an order requiring Coates to pay civil penalties under the Securities Enforcement Remedies and Penny Stock Reform Act of 1990, 15 U.S.C. § 78u(d) ("the Remedies Act"). Coates claims that no civil penalties should be assessed against him. For the following reasons, this court GRANTS the Commission's motion in part and denies it in part and DENIES Coates' motion.

## I. BACKGROUND

### A. Procedural History

On July 22, 1994, the Commission filed a complaint against defendants, alleging, among other things, that they violated Section 10(b) of the Exchange Act and Rule 10b–5 thereunder by making false and misleading statements to investors in connection with the sale of Coates International, Ltd. ("CIL") securities. *See* Pl.'s R.

56.1 Stm't ¶ 1.[1] The Commission sought a permanent injunction, disgorgement, and civil penalties against defendants pursuant to the Remedies Act. *See id.* ¶ 3. On July 22, 1994, the court, upon application made by the Commission on the same date, granted the Commission interim relief, including an asset freeze as to both Coates and CIL and the appointment of a temporary receiver for CIL. *See id.* ¶¶ 3, 112. The temporary receiver was directed to take possession of the assets of CIL, to operate the business, and otherwise to maintain the status quo. *See* July 10, 1996 Opinion and Order at 2–3. In violation of this order, Coates' wife subsequently withdrew $25,000.00 from their joint bank account. *See id.* ¶ 113.

On February 21, 1995, the court entered two final consent judgments as to Coates and CIL ("Coates Judgment" and "CIL Judgment") that settled this matter, except for the issue of civil penalties against Coates. *See id.* ¶¶ 5, 6. The consent judgments permanently enjoined Coates and CIL from violating Sections 5(a), 5(c) and 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b–5. *See* Pl.'s Mem. Supp. Summ. J. at 5. The consent judgments also required Coates and CIL to disgorge certain funds and other assets. *See id.* The extent of the defendants' obligations to disgorge funds depended, in part, on the results of a registered rescission offer to certain purchasers of CIL stock. *See id.* The CIL Judgment discharged the temporary receiver and, instead, named him as Special Master of CIL, with specific responsibilities including assisting in CIL's compliance with the consent judgments. *See* July 10, 1996 Opinion and Order at 3.

The Coates Judgment froze all of Coates' assets other than certain salary. *See* Pl.'s R. 56.1 Stmt. ¶ 114. The day after issuing the Coates Judgment, Coates transferred his patents relating to the Coates System to his son, Gregory Coates, in exchange for one dollar, in violation of the asset freeze. *See id.* ¶ 115. Paragraph XI of the Coates Judgment stated that the court reserved judgment as to the issue of civil penalties against Coates and set forth certain factors for the court to consider in determining whether civil penalties are warranted. *See id.* ¶ 6.

The consent judgments permanently enjoined Coates and CIL from violating federal securities laws and called for the disgorgement of certain funds and assets. *See id.* ¶ XX. The CIL Judgment required that CIL make a registered offer ("rescission offer") to all persons who purchased CIL stock from CIL or Coates from April 24, 1990 to February 21, 1995, the date of the rescission offer. Coates and CIL were required to pay the amounts due to the rescinding shareholders. *See* Pl.'s R. 56.1 Stm't ¶ 117. Prior to the distribution of funds to rescinding shareholders, the Special Master was to propose, subject to approval and order of the court, a plan of distribution. *See id.* ¶ 118.

Without seeking the court's prior approval, Coates and CIL solicited and obtained money from some of its remaining shareholders, placed that money in a bank account outside of the Special Master's control, and used that money to pay some of the rescinding shareholders. *See id.* ¶ 119. The rescission offer has been fully implemented, with only thirty-two shareholders electing to receive cash in exchange for their CIL stock. *See id.* ¶ 116. The total amount due to the rescinding

---

1. Except where otherwise noted, citations to "Pl.'s R. 56.1 Stm't" also incorporate the relevant corresponding paragraph(s) in "Def. Coates' Revised R. 56.1 Stm't" dated September 10, 1997 and refer to undisputed facts.

shareholders was $1.27 million plus interest at the annual rate of five percent. *See id.* ¶ 116. Of the total amount due, $900,000 had been invested by two shareholders. *See* Def.'s R. 56.1 Stmt. ¶ 119B.

The CIL Judgment required that CIL file a registration statement with respect to the rescission offer by July 21, 1995. CIL's registration statement was twice amended, and on November 13, 1995, the Second Amended Registration Statement was declared effective. *See* Pl.'s R. 56.1 Stmt. ¶¶ 9–10. Coates signed the Second Amended Registration Statement on CIL's behalf in his capacity as, among other things, president, principal executive officer, and a director of CIL. *See* Pl.'s Mem. Supp. Summ. J. at 6.

The proceedings in this case were initially before Judge Wood who oversaw the defendants' conduct after the entry of the consent judgment as well as the funding of the rescission offer. Judge Wood entered multiple rulings some of which appear in the following court orders: (1) Opinion and Order dated July 10, 1996, (2) Opinion and Order dated August 19, 1996, (3) Order dated August 20, 1996, and (4) Order dated September 9, 1996. *See* Pl.'s R. 56.1 Stmt. ¶ 12.

In the August 19, 1996 Order, the court rejected a request by Coates that he not be ordered to relinquish tangible assets to satisfy his obligation to fund payments to the rescinding shareholders unless a sale of his intangible assets (i.e. his CIL stock) failed to generate the required amount of cash, and held as follows:

> In light of the bad faith that Coates has demonstrated throughout this litigation as set forth in this order and in my previous orders in this matter—*see, e.g.,* [August 1994 Order] (describing withdrawal of $25,000 from Coates' bank account by Coates' wife after Coates had been informed of temporary restraining order issued by this court freezing his assets)—I order Coates to transfer title to his automobiles and his Rental Property to the Special Master on or before August 26, 1996.

*See id.* ¶ 120. In this order, the court also required Gregory Coates to transfer the patents back to Coates on or before August 26, 1996 and required Coates to transfer the patents to the Special Master on August 27, 1996. *See id.* ¶ 121. In the August 20, 1996 Order and the September 1996 Order, the court extended the deadlines for performance of the transfers to September 10, 1996. *See id.* ¶¶ 122, 123. The September 1996 Order also required Coates to transfer title to all of his automobiles to the Special Master on or before September 10, 1996. *See id.* ¶ 123. The transfers of the patents and automobiles did not take place on or before September 10, 1996. *See id.* ¶ 124. Untimeliness aside, Coates complied with every order of the court. *See* Def.'s R. 56.1 Stmt. ¶ 124B.

The rescission offer process concluded in July 1997. On July 15, 1997, Judge Wood entered an order detailing the conditions under which the Special Master would be discharged. *See* July 15, 1997 Order. The July 15, 1997 Order also appointed the Special Master to be Escrow Agent for the sole and limited purpose of holding the escrow sum which consisted of the interest payments still owed to two of the rescinding shareholders. *See id.* On July 31, 1997, Judge Wood entered an Order Vacating Restraints Against George J. Coates. In this order, the restraints imposed in Paragraph VII of the Coates Judgment were vacated; however, the terms of all prior orders including the Coates Judgment were not altered. *See* July 31, 1997 Order.

On July 10, 1997, Coates filed a motion seeking an order stating that civil penalties would not be assessed against him,

and in response, the Commission sought leave to file a motion for summary judgment against Coates. On September 30, 1997, the court granted the Commission leave to bring its motion for summary judgment.

In an order dated August 8, 1997, Judge Wood denied defendants' request that they should be relieved of their obligation under the CIL Judgment and subsequent court orders to pay interest to the Quintas Trust and Rainer Heubach, two of the rescinding shareholders. *See* August 8, 1997 Order. The interest is in an escrow account under the auspices of the Escrow Agent, the former Special Master. *See id.* By order dated August 15, 1997, Judge Wood denied a motion by defendants to reconsider her August 8, 1997 order; however, she granted a stay of the August 8, 1997 order to pay interest until a final decision was issued on the summary judgment motion regarding civil penalties. *See* August 15, 1997 Order.

This case was subsequently transferred from Judge Wood to Judge Motley on October 30, 1998. The pending motions were argued orally on November 19, 1998.

## B. *Factual History*

Coates founded CIL in October 1991. *See* Pl.'s R. 56.1 Stmt. ¶ 13. Coates is the inventor of the Coates System, a spherical rotary valve system for use in piston driven internal combustion engines. *See id.* ¶ 16. CIL's business is entirely dependent on the activities of Coates, who at times has been CIL's president, chairman, chief executive officer, and controlling stockholder. *See id.* ¶ 15. From CIL's inception through November 1, 1995, the Coates System has been the only actual or potential source of operating revenue for CIL. *See id.* ¶ 19. During the period subject to the rescission offer, Coates and CIL sold a total of 478,350 shares of CIL stock at prices of $5, $10, $20, and $30 per share for a total of $6,578,000 in gross proceeds. *See id.* ¶ 14.

## 1. *EPA Emissions Standards*

All new motor vehicles or new motor vehicle engines for sale in the United States intended for road use, including those with engines equipped with the Coates System, are subject to Environmental Protection Agency ("EPA") emissions standards and are required to pass a series of tests known as the Federal Testing Procedure or "FTP" tests. *See id.* ¶¶ 20, 22; *see also* 40 C.F.R. § 86.090–5. Included in the regulations governing the emissions testing component of the FTP tests is a requirement that emissions tests be conducted using a machine known as a chassis dynamometer ("dynamometer"). *See* Pl.'s R. 56.1 Stmt. ¶ 21; *see also* 40 C.F.R. § 86.135. Prior to July 1994, CIL never received a Certificate of Conformity from the EPA stating that engines modified with the Coates System were in compliance with applicable federal emission standards. *See* Pl.'s R. 56.1 Stmt. ¶ 25. Before July 1994, the EPA never conducted any emissions tests or other tests involving the Coates System or vehicles associated with the Coates System, CIL, or Coates. *See id.* ¶ 26.

Engines modified with the Coates System technology were tested in February and August 1990 and February 1991 at Compliance and Research Services, Inc. ("Compliance"), an independent motor vehicle emissions testing contract laboratory recognized by the EPA. *See id.* ¶ 27. The tests performed at Compliance indicated emission levels of pollutants that were substantially higher than the maximum emission levels permitted under EPA regulations. *See id.; see also* Pl.'s Ex. 2, CIL Second Am. Registration Stmt. ("Reg.St.") at 26. The Compliance tests were per-

formed using a dynamometer, a machine required under federal regulations to be used for independent emission testing. *See* Pl.'s R. 56.1 Stmt. ¶¶ 21, 28. Coates received the results of the Compliance tests and was aware of the EPA emissions standards. *See id.* ¶¶ 29, 32.

CIL disseminated two documents dated December 6, 1991 to CIL stockholders and other potential investors regarding a private offering of CIL's Series A Preferred Stock ("December 1991 Offering"). *See id.* ¶ 33. These documents were titled "Confidential Private Offering Memorandum" and "Confidential Information Memorandum." Coates testified at his deposition that he personally provided Deloitte & Touche, the preparers of the December 1991 memoranda, with the information contained therein. *See id.* ¶ 35. The Confidential Information Memorandum stated that the Coates System modified "engine, under an internally supervised test, far surpassed the emission standards imposed by the [EPA]." *Id.* ¶ 38. It further stated that the "Coates engine emits significantly lower levels of pollutants than a conventional engine" and listed comparisons between the federal emissions standard and the Coates System in a chart entitled "Comparative Analysis":

| Exhaust Emissions | Federal Standard | Coates System | Improvement |
|---|---|---|---|
| CO (%) | 1.2 | .2 | 84% |
| HC (ppm) | 220 | 97 | 56% |

Pl.'s Ex. 10, Confidential Info. Mem. at 13. However, the testing that produced the figures listed above was not performed at an independent motor vehicle emissions testing contract laboratory recognized by the EPA. The tests were performed at a CIL facility using a machine other than a dynamometer. *See* Pl.'s R. 56.1 Stmt. ¶ 40. Additionally, neither memoranda referenced above disclosed anything about the 1990–91 Compliance test results, which stated that the emissions levels of a Coates System engine were substantially higher than the maximum levels permitted by the EPA. *See id.* ¶ 41.

In a letter to CIL stockholders and other potential purchasers of CIL stock dated March 24, 1992, Coates wrote:

> [O]ur first official independent emission test has indicated the lowest emissions in the world.... Further testing with the EPA is continuing and should be completed within six weeks depending on the schedules.

Pl.'s Ex. 7, Larkin Decl. Ex. A, March 24, 1992 Letter. The letter also contained a solicitation to purchase additional CIL stock. *See id.; see also* Pl.'s R. 56.1 Stmt. ¶ 45.

Similarly, in a letter to CIL stockholders and other potential purchasers of CIL stock dated March 26, 1992, Coates wrote:

> The results of our first independent emissions test have demonstrated that our design produces the lowest level of pollutants in the world. In fact, we have eliminated some of the most harmful emissions *completely....* With further EPA testing going as scheduled, this phase of evaluation should be finished within six weeks.

Pl.'s Ex. 8, Carter Decl. Ex. A, March 26, 1992 Letter. The letter also contained a solicitation to purchase additional CIL stock. *See id.; see also* Pl.'s R. 56.1 Stmt. ¶ 49.

### 2. *Harley–Davidson*

The Coates System was evaluated by two third parties, Harley–Davidson, Inc. ("Harley") and Chrysler. *See* Pl.'s R. 56.1 Stmt. ¶¶ 52, 68. Under a July 1991 prototype manufacturing agreement between CIL and Harley, CIL tried to retrofit the Harley motorcycle engine with the Coates System. Harley conducted dynamometer tests of two prototype motorcycle engines modified with Coates System technology.

On or about November 1991, Harley notified Coates of the test results on the Harley modified engines. *See id.* ¶ 53. The test results indicated that the prototype engines had experienced mechanical durability problems. *See id.* ¶ 52; *see also* Pl.'s Ex. 11, Tuttle Dec. Ex. B, Harley November 18, 1991 Letter to Coates ("Harley Letter"). Specifically, the Harley tests revealed several problems with the modified Harley engines, including "valve train failure" of one engine and deep score marks on the rear exhaust rotary valve and seal of the second engine. *See* Pl.'s R. 56.1 Stmt. ¶ 54; *see also* Harley Letter. The Harley engineers offered the following conclusions as to the two prototype engines equipped with the Coates System in their November 18, 1991 letter to Coates:

1. The reliability /durability of the current rotary valve trains systems for both engines is inadequate.

2. The exhaust valve to seal clearance appears to be insufficient.

3. The durability of the valve seal itself is questionable.

4. The engine power potential of the 1340 is far less than required, probably due to the insufficient flow through the ports and valves.

Harley Letter.

The November 18, 1991 letter advised Coates of Harley's decision to discontinue testing of the engines equipped with the Coates System in favor of other projects. *See* Pl.'s R. 56.1 Stmt. ¶ 53; *see also* Harley Letter. The letter did not terminate the relationship with Coates; rather, it stated that Harley would contact Coates "regarding possible ways to proceed with the development of your system for our engines." *See* Def.'s R. 56.1 Stmt. ¶ 56G; *see also* Harley Letter. Harley sent a subsequent letter to Coates dated December 3, 1991 in which it reiterated its continued interest in the Coates System. *See*

Def.'s R. 56.1 Stmt. ¶ 56G; *see also* Pl.'s Ex. 11, Tuttle Dec. Ex. C, Harley December 3, 1991 Letter to Coates. As of November 1, 1995, CIL had never developed a retrofitted Harley motorcycle engine using the Coates System that was acceptable to Harley. *See* Pl.'s R. 56.1 Stmt. ¶ 58.

CIL's December 1991 Confidential Information Memorandum stated that engine prototypes were sent to a "major motorcycle manufacturer." *Id.* ¶ 59. However, the memorandum did not disclose any of the problems detailed in the November 18, 1991 Harley letter to Coates. *See id.* ¶ 61. In a letter to CIL stockholders and potential purchasers of CIL stock dated July 6, 1992, Coates wrote: "Harley–Davidson's Motorcycle Engine is now complete, and has been returned to them for final testing. We are awaiting their response." Pl.'s Ex. 8, Carter Decl. Ex. B, July 6, 1992 Harley Letter. The letter also contained a solicitation to purchase additional CIL stock. *See id.; see also* Pl.'s R. 56.1 Stmt. ¶ 65. The July 6, 1992 letter does not disclose any of the problems detailed in the November 18, 1991 Harley letter to Coates. *See* Pl.'s R. 56.1 Stmt. ¶ 66.

### 3. *Chrysler*

Chrysler also evaluated engines equipped with the Coates System technology at a CIL facility in May 1993. *See id.* ¶ 68. In a report dated June 3, 1993, Chrysler engineers advised that "no further activity should be undertaken at this time" due to the lack of "documented proof . . . to substantiate that [the Coates] valve train system functions as claimed." Pl.'s Ex. 12, Chrysler Report. The report further detailed other shortcomings of the Coates System, noting that "documented proof of component durability, system performance, and emissions characteristics does not exist" and that the "[c]omponents demonstrated at the [CIL facility]

were not acceptable to the [Chrysler] engineering team for the proper material application nor their tribology interaction." *Id.* However, the report did describe the potential benefits of the Coates System, including its potential for good emission development and its compatibility with alternative fuels. *See id.* Coates admitted that he received a copy of the Chrysler report and stated that the "tests [CIL] had to date at that time were not anywhere near the standards that Chrysler has for testing." *See* Pl.'s R. 56.1 Stmt. ¶ 74.

The following statement appeared in a letter distributed to CIL investors dated August 4, 1993:

> Seven engineers from Chrysler Corporation visited our plant where we demonstrated a number of engines for them. They appeared very interested and are making reports to the Executive Committee in Chrysler Corporation. We are waiting to hear from them.

Pl.'s Ex. 13. This letter stated that the private stock offering was closed and that no more stock could be sold under that offering. *See id.* The letter also contained an offer to refund the investment of any investor who was not satisfied with CIL's progress. *See id.; see also* Pl.'s R. 56.1 Stmt. ¶ 76. The letter did not disclose the contents of the June 1993 Chrysler Report.

### 4. *Orders for the Coates System*

In order to continue the development and testing of the Coates System, CIL required substantial amounts of additional funding. *See id.* ¶¶ 79–80. Prior to July 1994, CIL did not obtain the necessary additional financing to complete the development and testing of the Coates System nor did it have the manufacturing capability to mass produce or sell the Coates System engines. *See id.* ¶¶ 81, 87. Prior to November 1, 1995, CIL had neither the manufacturing capacity nor the financing to manufacture or sell engines on a commercial scale. *See id.* ¶ 88. Furthermore, CIL had no binding sales orders for the Coates System engines as of November 1, 1995. *See* Reg. St. at 22–24.

The March 24, 1992 and March 26, 1992 stockholder letters both state that CIL had firm orders for 5000 four-cylinder Coates Spherical Rotary Valve Systems per year. *See* Pl.'s R. 56.1 Stmt. ¶¶ 91, 92. The July 6, 1992 stockholder letter states: "We have just received five engines from Italy for which the actual order has gone up to 15,000 yearly." Pl.'s Ex. 8, Carter Decl. Ex. B, July 6, 1992 letter. Additionally, a potential purchaser of CIL stock received from CIL a letter, dated October 7, 1992, that states: "We have orders for literally hundreds of thousands of engines for different types of applications." *See* Pl.'s R. 56.1 Stmt. ¶ 94; *see also* Pl.'s Ex. 14, Hervert Decl. Ex. B, October 7, 1992 letter. All of these letters included solicitations to purchase CIL stock; however, these letters did not disclose CIL's inability to manufacture or sell engines on a commercial scale nor the fact that none of the orders taken by CIL were firm orders. *See* Pl.'s R. 56.1 Stmt. ¶¶ 95–97; *see also* Reg. St. at 22–24. In his sworn testimony before the Commission on July 14, 1994, Coates explained that because final testing and other prerequisites to "mass production" had yet to be completed, "it is going to take at least twelve months or maybe two years" before CIL can "have a product to sell to the public." Pl.'s Ex. 4, Coates Tr. at 396–98.

### 5. *Defendants' Failure to Disclose the Reassignment of the Coates System Engine Patents*

Five patents for the Coates System were issued to Coates before February 5,

1991. *See* Pl.'s R. 56.1 Stmt. ¶ 99. Coates assigned these patents to CIL on December 5, 1991, one day before the beginning of the December ·1991 Offering. *See id.* ¶ 100. These assignments were disclosed in the appendix to the Confidential Information Memorandum. *See id.* ¶ 101. On January 1, 1992, CIL's Board of Directors authorized the transfer of these patents back to Coates in return for an exclusive right to negotiate licenses and transfers of technology associated with the patents, and on June 29, 1992, CIL reassigned the patents to Coates. *See id.* ¶¶ 102, 103. These authorizations and reassignments were not disclosed by Coates or CIL prior to July 1994. *See id.* ¶ 104.

## C. *The Arrest and Incarceration of Coates in Connection with this Action*

On July 22, 1994, the same day that the Commission obtained the initial injunction from the court, Coates was arrested by members of the United States Postal Inspection Service pursuant to a warrant for his arrest issued that same day by the court on the basis of a mail fraud complaint sworn to by a Postal Inspector and approved by an Assistant United States Attorney. *See* Pl.'s R. 56.1 Reply Stmt. ¶ 3A. The complaint was based in part on evidence obtained by the Commission through its inquiry and investigation. *See id.* Because Coates was arrested late on a Friday, he was incarcerated in the Mercer County jail until he could be moved to the federal jail in Manhattan. *See* Def.'s R. 56.1 Stmt. ¶ 3B. Upon application by counsel, Coates was released from jail by a federal magistrate in the Southern District of New York on July 26, 1994, without the posting of cash or a bail bond. *See id.* ¶ 3C. Coates was incarcerated for five days. *See id.* ¶ 3D. The Office of the United States Attorney for the Southern District of New York dismissed the criminal charges. *See id.* ¶ 3F.

## II. DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment should be granted where "[t]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). To defeat a summary judgment motion, the opposing party must "[c]ome forward with 'specific facts showing that there is a genuine issue for trial.';" *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue is present when the record would enable a reasonable trier of fact to return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

### B. *Coates' Violations of the Exchange Act*

The Exchange Act and its promulgating regulations prohibit fraud in connection with the purchase and sale of securities. *See* 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b–5. With respect to fraud, the Exchange Act provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... (b) To use or employ, in

connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Pursuant to the Exchange Act, Rule 10b–5 was promulgated to prohibit fraud in connection with the purchase and sale of securities, providing that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To have violated Section 10(b) and Rule 10b–5, defendant must have: (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities. *See SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir.1999).

To be material, misrepresented or omitted information must be relevant to the investor's decision of whether to purchase, hold, or sell the relevant security. *See, e.g., Basic, Inc. v. Levinson,* 485 U.S. 224, 231–232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). An omission of information is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

"The scienter needed in connection with securities fraud is intent 'to deceive, manipulate, or defraud,' or knowing misconduct." *Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999) (*quoting SEC v. First Jersey Sec.,* 101 F.3d 1450, 1467 (2d Cir.1996)). As a threshold matter, the complaint must allege that Coates acted with sufficient scienter. *See SEC v. U.S. Environmental, Inc.,* 155 F.3d 107, 111 (2d Cir.1998). The complaint in this case alleges that Coates acted knowingly or recklessly. "Knowing misconduct" is sufficient to establish liability under securities fraud statutes. *See First Jersey Sec.,* 101 F.3d at 1467. Furthermore, "[i]n order to establish scienter ..., [it is sufficient that] the plaintiffs ... identify circumstances indicating conscious or reckless behavior by the defendants." *Chill v. General Elec. Co.,* 101 F.3d 263, 267 (2d Cir.1996).

Although determining issues of materiality and scienter on summary judgment requires caution, this court nonetheless has the authority to determine these issues on motion. *See* FED. R. CIV. P. 56. As to the issue of materiality, the Supreme Court has articulated the following standard:

The determination [of materiality] requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly one for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriate for summary judgment.

*TSC Indus.*, 426 U.S. at 450, 96 S.Ct. 2126. As to the issue of scienter, this court notes that determining a person's subjective state of mind is peculiarly inappropriate for resolution by summary judgment. Here, however, as discussed below, various representations were clearly material and knowingly false and various omissions were obviously material and were known to Coates.

This court notes that the Commission's motion for summary judgment was supported by extensive documentation of Coates' fraud violation. The documentation included a transcript of Coates' testimony taken during the Commission's investigation [2] and documents drafted by the defendant himself, including the registration statement Coates submitted to the Commission. In response to the Commission's well-documented motion, Coates' Revised Local Rule 56.1 Statement of Material Facts admits the truth of the majority of material facts set forth in the Commission's Local Rule 56.1 Statement of Material Facts.

After considering the parties' voluminous submissions, this court finds that Coates has violated the anti-fraud provisions of the Exchange Act by knowingly making misrepresentations and omissions of material facts in connection with the sale of CIL securities. Coates violated the Exchange Act with respect to his statements regarding (1) the EPA emissions testing, (2) CIL's interactions with Harley–Davidson, (3) the orders for the Coates System, and (4) the reassignment of the patents from CIL to Coates. This court also finds that Coates statements regarding Chrysler did not violate the Exchange Act.

### 1. Misrepresentations and Omissions Regarding EPA Emissions Standards

Coates' statements concerning the EPA emissions testing violated the Exchange Act's anti-fraud provisions. In the Confidential Information Memorandum, which was disseminated to potential investors regarding a private offering of CIL stock, Coates stated that the Coates System engine "under an internally supervised test, far surpassed the emissions standards imposed by the [EPA]." In addition to this, the memorandum included a chart listing comparisons between the federal emissions standards and the Coates System engine emissions.

The "internally supervised test" was not performed at an EPA-approved laboratory, and was not performed with a dynamometer. Thus, the statements in the memorandum and the comparisons in the chart give a false impression that the Coates System engine's emissions levels would satisfy EPA requirements. Coates states that the statement in the memorandum is accurate because the tests referred to were conducted internally. However, Coates does not address CIL's inability to

---

**2.** Sworn testimony taken in an SEC investigation may be used pursuant to Rule 56(c) on a motion for summary judgment. *See SEC v.* *Research Automation Corp.*, 585 F.2d 31, 34 n. 5 (2d Cir.1978).

determine through its in-house tests whether its engines could comply with EPA or federal requirements without the use of a dynamometer. "A recklessly inaccurate and incomplete placement memorandum cannot be used to gull and lull an investor." *Spatz v. Borenstein,* 513 F.Supp. 571, 585 (N.D.Ill.1981).

Furthermore, Coates represented in the March 24, 1992 and March 26, 1992 stockholder letters that the Coates System engines were either being testing by the EPA or were undergoing some sort of EPA testing. Coates also referred to an independent emissions test which indicated that the Coates System engines had the lowest emissions in the world. On the whole, the letters indicate that the independent emissions test is related to official EPA testing or EPA testing requirements. In fact, the EPA never conducted any testing of the Coates engines and the only EPA testing facility that did conduct tests on the Coates System engines found emissions levels *higher* than those required by the EPA.

Coates states that EPA emissions standards are irrelevant because Coates was designing racing engines which do not require EPA approval. Although it is true that one of CIL's targeted industries was the racing industry, the December 1991 Offering memoranda and the Second Amended Registration Statement do not limit the applications of Coates System engines to racing. In addition, Coates himself made the EPA standards relevant by promoting their importance in his correspondence with stockholders and potential stockholders. This court therefore finds that Coates statements in the December 1991 memorandum and in the two March 1992 stockholder letters were material misrepresentations. *See, e.g., Hoffman v. Estabrook & Co., Inc.,* 587 F.2d 509, 514–15 (1st Cir.1978) (representation

that company had working prototype of computer system violated the anti-fraud provisions where company at most had developed laboratory and engineering prototypes). Furthermore, Coates knew at the time that he made the statements in the December 1991 memorandum and the March 1992 stockholder letters that the EPA was not involved in any testing of the Coates System and that the independent testing to which he referred was not conducted by an EPA-approved facility.

■ Coates also omitted information in the December 1991 memorandum and in the March 1992 stockholder letters concerning the results of the Compliance tests which revealed emission levels that were substantially higher than the EPA maximums. Coates states that the Compliance test results are immaterial because (1) the purpose of the testing was not to access emissions levels; (2) the vehicle tested was not equipped with an air pump, EGR valve, or catalytic converter which are pollution reduction devices; and (3) following the Compliance tests but prior to the December 1991 memorandum, Coates made improvements to the Coates System. *See* Def.'s R. 56.1 Stmt. ¶¶ 27C, 32A; *see also* Pl.'s Ex. 4, Coates Tr. at 278–282. Given the lapse of time between the Compliance tests and the December 1991 Offering, the possible improvements made to the Coates System between those times, and the lack of pollution reduction features on the vehicle tested, this court cannot determine whether a reasonable investor would have found the Compliance test results "so obviously important" as to make their omission material. *See TSC Indus.,* 426 U.S. at 450, 96 S.Ct. 2126.

### 2. *Misrepresentations and Omissions Regarding Harley–Davidson*

Coates' omissions regarding Harley's test results do not violate the Exchange

Act; however, Coates' misrepresentations with regard to Harley's testing of the Coates System do violate the Exchange Act's anti-fraud provisions.

■ In November 1991, Harley notified Coates that it was discontinuing testing of the Coates prototype engines because of mechanical durability problems. However, Coates did not include this information or the adverse results of the evaluations performed by Harley in the December 1991 Offering memoranda. Coates contests the materiality of the Harley test results stating that the malfunctions were caused by the Harley engineers' disregard of Coates' test protocol. *See* Def.'s R. 56.1 Stmt. ¶ 56C. Coates also states that the only parts of the engine that were damaged were Harley parts rather than Coates parts. *See id.* ¶ 56E. The issues raised by Coates concerning the November 18, 1991 Harley test results prevent this court from deciding whether a reasonable investor would find the omission of this information important given the total mix of information. *See TSC Indus.,* 426 U.S. at 450, 96 S.Ct. 2126. Therefore, this court cannot determine on this motion whether the omission is material.

■ However, in addition to omitting information regarding the Harley test results, Coates represented in the July 6, 1992 stockholder letter that Harley was conducting final testing on the Coates System engines. It is not contested that, in fact, Harley was not conducting final testing on any Coates engines. Coates' misrepresentations concerning Harley's testing of the Coates System in the July 6, 1992 stockholder letter are material. *See, e.g., Alna Capital Assocs. v. Wagner,* 532 F.Supp. 591, 598 (S.D.Fla.1982) (finding inaccurate report concerning nature of distributorship agreement for major product material). Coates acted with the requisite scienter since he knew before July 6, 1992

that Harley had discontinued testing and was not engaged in any final testing of the Coates prototype engines.

### 3. *Misrepresentations and Omissions Regarding Orders*

■ Coates violated the anti-fraud provisions of the Exchange Act due to his misrepresentations and omissions regarding orders for Coates System engines. The March 24, 1992, March 26, 1992, July 6, 1992, and October 7, 1992 stockholder letters Coates mailed to investors or potential investors indicated that CIL had a substantial number of firm orders for engines equipped with the Coates System. The Commission has demonstrated that CIL did not possess firm orders for Coates System engines at the time these letters were mailed. The Commission also points to Coates' investigation testimony and the registration statement he submitted to the Commission to show that Coates knew his representations concerning the orders were misleading. Coates' misrepresentations concerning firm orders and his omissions concerning CIL's inability to manufacture or sell engines commercially are material since there is a substantial likelihood that such information would be perceived as important by a reasonable investor. *See, e.g., SEC v. Research Automation Corp.,* 585 F.2d 31, 35 & n. 8 (2d Cir.1978); *see also San Leandro Emerg. Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 810 (2d Cir.1996) ("[M]aterial facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities.") (*quoting SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968)).

Coates has failed to show the existence of a genuine issue of material fact concerning the orders. He submits that CIL did possess thousands of engine orders. *See* Def.'s R. 56.1 Stmt. ¶ 83H. However, his attached exhibit of these orders shows that the orders are either provisional orders or inquiries establishing interest in ordering; Coates' exhibit does not demonstrate any firm orders. *See* Def.'s Ex. 44. Coates also submits that although CIL could not manufacture engines at the time his statements were made, CIL was capable of entering into licensing agreements. *See* Def.'s R. 56.1 Stmt. ¶¶ 84–88. However, Coates cannot establish that any licensing agreement was successfully finalized during the time his statements were made.

### 4. *Mispresentations and Omissions Regarding the Patents*

■ Coates also violated the Exchange Act with respect to his representations regarding the ownership of the five patents for the Coates System. By assigning his rights in the Coates System patents to CIL one day before the December 1991 Offering and failing to disclose that CIL authorized the transfer of the patents back to him in January 1992, Coates fraudulently misrepresented his rights to the Coates System. These misrepresentations and omissions are material and relevant to the sale of stock because the ownership of the engine patents was one of CIL's principal assets. Furthermore, Coates clearly acted with the requisite scienter since he knew the patents were transferred to him by CIL in January 1992 and did not update the information contained in the December 1991 memorandum. *Cf. IIT v. Cornfeld,* 619 F.2d 909, 927 (2d Cir.1980) (accounting firms "do have a duty to take reasonable steps to correct misstatements they have discovered in previous financial statements on which they know the public is relying."); *SEC v. Manor Nursing Centers,*

458 F.2d 1082, 1095 (2d Cir.1972) ("Post-effective developments which materially alter the picture presented in the registration statement must be brought to the attention of public investors."). Coates does not deny the reassignment of the patents and the nondisclosure of this reassignment.

### 5. *Misrepresentations and Omissions Regarding Chrysler*

■ Coates' statements and omissions concerning his dealings with Chrysler did not violate the Exchange Act. Coates received the results of the Chrysler test, dated June 3, 1993, which found no proof that the system functioned as claimed. The results of the Chrysler tests were not included in the August 4, 1993 stockholder letter, and furthermore, this letter misrepresents Chrysler's level of interest in the Coates System.

The court need not decide whether the omission and misrepresentation concerning Chrysler contained in the August 4, 1993 letter are material. The omission and misrepresentation do not fall within the ambit of section 10(b) or Rule 10b–5 because they were not made in connection with the purchase or sale of securities. *See Superintendent of Insur. of New York v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) (indicating that where a deception touches a purchase or sale of securities the "in connection with" requirement of section 10(b) is met). In fact, the letter was only sent to stockholders of CIL and explicitly stated that the private stock offering was closed. *See, e.g., Kellman v. ICS, Inc.,* 447 F.2d 1305, 1308–09 (6th Cir.1971) ("Their ownership of that stock inherently would make them 'purchasers' in the sense that at some point in time they would have had to acquire the stock. However, their ownership of the stock does not make them 'purchas-

ers' ... since their 'purchases' occurred prior to the alleged fraud of which they complain.").

## C. *Civil Penalty Against Coates*

As discussed above, this court finds that Coates has violated federal securities laws due to: (1) his misrepresentations concerning EPA emissions standards in the December 1991 memorandum, the March 24, 1992 stockholder letter, and the March 26, 1992 stockholder letter; (2) his misrepresentations concerning Harley's testing of the Coates prototype engines in the July 6, 1992 stockholder letter; (3) his misrepresentations and omissions concerning orders for Coates System engines in the March 24, 1992, March 26, 1992, July 6, 1992, and October 7, 1992 stockholder letters; and (4) his failure to correct the statement contained in the December 1991 memorandum with regard to ownership of the Coates System patents.

Due to Coates' violations of the Exchange Act, the Commission asks this court to impose civil penalties against Coates pursuant to the Securities Enforce-ment Remedies and Penny Stock Reform Act of 1990, 15 U.S.C. § 78u(d)(3) ("the Remedies Act").[3] The Commission suggests that each of Coates' violations should fall under the third tier of civil penalties available under the Remedies Act and that the total amount imposed should be $100,000. *See* 15 U.S.C. § 78u(d)(3)(B)(iii) (allowing $100,000 penalty against a natural person if violation involved fraud and created a significant risk of substantial losses to other persons).

The Remedies Act was enacted to achieve "the dual goals of punishment of the individual violator and deterrence of future violations." *SEC v. Moran*, 944 F.Supp. 286, 296 (S.D.N.Y.1996). The House Report on the Remedies Act states:

The Committee believes that the money penalties proposed in this legislation are needed to provide financial disincentives to securities law violations other than insider trading.... Absent a criminal prosecution or a private suit for damages ... even the defendant who makes a deliberate decision to vio-

---

**3.** 15 U.S.C. § 78u(d)(3) provides as follows:

(A) Authority of Commission -
Whenever it shall appear to the Commission that any person has violated any provision of this chapter, the rules or regulations thereunder, ... the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation.
(B) Amount of penalty -
(i) First tier—The amount of the penalty shall be determined by the court in light of the facts and circumstances. For each violation, the amount of the penalty shall not exceed the greater of (I) $5,000 for a natural person or $50,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation.
(ii) Second tier—Notwithstanding clause (i), the amount of penalty for each such

violation shall not exceed the greater of (I) $50,000 for a natural person or $250,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation described in subparagraph (A) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.
(iii) Third tier—Notwithstanding clauses (i) and (ii), the amount of penalty for each such violation shall not exceed the greater of (I) $100,000 for a natural person or $500,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if—
(aa) the violation described in subparagraph (A) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and (bb) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

late the law and causes significant harm to the markets does not risk any monetary sanction more severe than an order of disgorgement. Disgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud. A violator who avoids detection is able to keep the profits resulting from illicit activities. Currently, even a violator who is caught is required merely to give back his gains with interest, leaving him no worse off financially than if he had not violated the law. The Committee therefore concluded that authority to seek or impose substantial money penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations that otherwise may provide great financial returns to the violator. H.R.Rep. No. 101–616, 101st Cong., 2d Sess., reprinted in 1990 U.S.C.C.A.N. 1379, 1384–86. The Exchange Act provides that any civil penalty is to be determined by the court "in light of the facts and circumstances" of the particular case. *See* 15 U.S.C. § 78u(d)(3).

■ Paragraph XI of the Coates Judgment specifically reserved the issue of whether civil penalties would be imposed against Coates in light of all facts and circumstances. The Coates Judgment set forth the following factors for the court to consider in determining whether to impose civil penalties:

(1) The egregiousness of the defendant's conduct;

(2) The degree of the defendant's scienter;

(3) Whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons;

(4) Whether the defendant's conduct was isolated or recurrent;

(5) The success of the Rescission Offer as measured by whether those shareholders who request a return of their investment receive a refund equal to the full amount of the money invested;

(6) The report of the Special Master to be prepared following the completion of the Rescission Offer; and

(7) Compliance by the defendant with the terms of this Final Judgment. The court may also consider whether the amount of any such penalty that would otherwise be appropriate should be reduced due to the defendant's demonstrated current and future financial condition.

Def.'s Ex. 23, Coates Judgment ¶ XI.

Coates argues that penalties should not be imposed against him because (1) he has complied with the terms and provisions of the Coates Judgment, including successfully completing the rescission offer, and (2) he believed that entering into the consent agreement with the Commission prevented the Commission from seeking such civil penalties. In opposition, the Commission argues that the greatest weight in determining the level and amount of penalties should be given to (1) the egregiousness of Coates' violations, (2) the degree of Coates' scienter, (3) the risk of loss to investors, and (4) Coates' lack of remorse and misconduct during the litigation.

After reviewing all of the evidence, this court finds that civil penalties are warranted in this matter. Coates' argument that he would not have entered into the Coates Judgment had he known that the Commission would later seek civil penalties against him is belied by the very terms of the consent judgment. Coates agreed to the terms of the Coates Judgment which included an express reservation of jurisdiction to this court to consider the appropriateness of a civil penalty. Therefore, this

court rejects Coates' argument that a civil penalty should not be imposed in a dispute that is settled. *See, e.g., SEC v. Custable,* 1996 WL 745372 (N.D.Ill.1996) (imposing a civil penalty for securities act violations despite fact that defendants had voluntarily entered into consent agreements with the SEC).

As to the seriousness of the violations and Coates' degree of scienter, Coates' anti-fraud violations went to the heart of the investment he was soliciting. The Coates System was both the centerpiece of Coates' promotional campaign and the sole potential source of future revenue for CIL. Thus, misrepresentations and omissions concerning the durability and marketability of the Coates System created a greater amount of risk to investors than they were aware of because they lacked the information necessary to access the pros and cons of their investment.

In addition to his violations of the Exchange Act, this court must also consider Coates' misconduct while this case was under the supervision of Judge Wood. Coates twice violated the terms of the asset freezes in place against him, did not comply with the provisions governing the rescission offer, and created repeated delays in carrying out the terms of the Coates Judgment, thereby requiring continuing intervention by the court.

Coates has also failed to take responsibility for his own actions and has instead placed blame for the difficulties this litigation has caused CIL on the Commission. Coates claims that the Commission brought this litigation in bad faith and seeks the ruin of CIL. Coates has also stated that the Commission has a "personal vendetta against Coates." Def.'s R. 56.1 Stmt. ¶ 5R. In *SEC v. Moran,* the court cited the defendant's penchant for "blaming others, including the SEC for his own conduct" and "downplaying of the viola-

tions for which he is liable" as additional factors warranting the imposition of a civil penalty. *See SEC v. Moran,* 944 F.Supp. at 296.

Against the above factors must be weighed the success of the rescission offer, the small number of investors who elected to take part in the rescission offer, the degree of support evinced by the non-rescinding shareholders, Coates' cooperation with the Special Master, and the arrest and incarceration of Coates. Although Coates did not conduct the rescission offer in the manner specified by the court, the rescission offer was ultimately successfully completed. Only 32 investors with a total investment of $1.27 million chose to participate in the rescission offer, and of those 32 investors, two shareholders had invested $900,000 of the $1.27 million. Those shareholders who did not elect rescission have repeatedly petitioned this court in favor of Coates voicing their belief in his commitment to CIL and to the best interests of CIL's shareholders. Coates also cooperated with the Special Master during the time that the Special Master was involved with the operations of CIL. Finally, it cannot be overlooked that Coates was arrested and spent five days in jail at the commencement of this action.

Given the above factors and considering them within the context of all of the facts and circumstances, this court finds that Coates should be assessed civil penalties in the amount of $10,000 per violation. This court has discussed four violations of the Exchange Act, and therefore, Coates is ordered to pay a civil penalty of $40,000 to the Treasury of the United States.

### D. *Interest Held by Escrow Agent*

Having resolved the issue of summary judgment and civil penalties, this court vacates the August 15, 1997 stay of the

August 8, 1997 order to pay interest to the Quintas Trust and Rainer Heubach. This court therefore orders the Escrow Agent to oversee the distribution of the monies held in the escrow account to the Quintas Trust and Rainer Heubach.

## III.  CONCLUSION

For the reasons detailed above, the Commission's motion for summary judgment is GRANTED in part and denied in part. Coates' motion for a finding that no civil penalties shall be assessed is DENIED.

The court finds that Coates has violated federal securities laws and ORDERS that Coates pay $40,000 to the Treasury of the United States.

This court also VACATES the August 15, 1997 stay and ORDERS the Escrow Agent to oversee the payment of interest to the Quintas Trust and Rainer Heubach from the monies held in the escrow account designated for this purpose.

The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.