**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**WORLDCOM, INC., Defendant.**

**No. 02 Civ. 4963(JSR).**

United States District Court, S.D. New York.

July 7, 2003.

As Corrected July 7, 2003.

Robert Blackburn, SEC–NERO, New York City, Arthur S. Lowry, William R. Baker, III, Peter H. Bresnan, Division of Enforcement, U.S. S.E.C., Washington, DC, for Plaintiff.

Paul C. Curnin, Simpson, Thacher & Bartlett, New York City, Richard C. Breeden, Richard C. Breeden & Co., Greenwich, CT, for Defendant.

## OPINION AND ORDER

RAKOFF, District Judge.

This case raises fundamental questions about how market regulators, and the courts, should respond when criminals use the vehicle of a public company to commit a massive fraud. While the persons who perpetrated the fraud can be criminally prosecuted, the exposure of the fraud often creates liquidity pressures that can drive the company into bankruptcy, leaving unsecured creditors with little and shareholders with nothing. Innocent employees may find their jobs in jeopardy, and, if the company is very large, entire segments of the market may be disrupted. In a situation where immense financial suffering is therefore likely, is there nothing government regulators can do to restore equilibrium?

In the case of WorldCom, Inc., we have perhaps the largest accounting fraud in history, with the company's income overstated by an estimated $11 billion, its balance sheet overstated by more than $75 billion, and the loss to shareholders estimated at as much as $200 billion. Those individuals who allegedly perpetrated the fraud are either under indictment or being criminally investigated by the Department of Justice; creditors are seeking recompense in the Bankruptcy Court (in the matters before Judge Gonzalez); and shareholders and employees are seeking through private class actions (in the matters before Judge Cote) to recover what they can, if not from the company (which is in bankruptcy), then from other alleged

participants in the effectuation of the fraud. These are the traditional responses.

In the instant lawsuit, however, the Securities and Exchange Commission (the "Commission"), with the full cooperation of the company's new management and significant encouragement from the Court-appointed Corporate Monitor (Richard C. Breeden, Esq.), has sought something different:

— not just to clean house but to put the company on a new and positive footing;

— not just to enjoin future violations but to create models of corporate governance and internal compliance for this and other companies to follow;

— not just to impose penalties but to help stabilize and reorganize the company and thereby help preserve more than 50,-000 jobs and obtain some modest, if inadequate, recompense for those shareholder victims who would otherwise recover nothing whatever from the company itself.

The first step in this journey, taken at the very outset of the litigation, was the joint decision of the parties to have the Court appoint a Corporate Monitor to oversee the proposed transformation. While the Corporate Monitor's efforts were initially directed at preventing corporate looting and document destruction, his role and duties have steadily expanded, with the parties' full consent, to the point where he now acts not only as financial watchdog (in which capacity he has saved the company tens of millions of dollars) but also as an overseer who has initiated vast improvements in the company's internal controls and corporate governance. Few if any companies have ever been subject to such wide-ranging internal oversight imposed from without; but to the company's credit it has fully supported the Corporate Monitor's efforts and the strict discipline thereby imposed.

Under the Corporate Monitor's watchful eye, the company has replaced its entire board of directors, hired a new and dynamic chief executive officer and begun recruiting other senior managers from without, fired or accepted the resignation of every employee accused by either the board's own Special Investigative Committee or the Bankruptcy Examiner of having participated in the fraud, and terminated even those employees who, while not accused of personal misconduct, are alleged to have been insufficiently attentive in preventing the fraud. In this connection, the company has already spent more than $50 million of its own money to fund unrestricted investigations by both the Special Investigative Committee and the Bankruptcy Examiner, and their detailed reports have been given wide publicity.

The company has also consented to a permanent injunction authorizing the Corporate Monitor to undertake a complete overhaul of the company's corporate governance and authorizing a group of highly-qualified independent consultants to ascertain that the company has fully eliminated the many defects in the company's internal controls detected after a comprehensive review by the company's new outside auditors. The new corporate governance strictures will, among much else, mandate an active, informed, and highly independent board, prohibit related-party transactions and conflicts of interest, require a unique shareholder role in the nomination of directors, and impose significant restrictions on executive compensation packages. Moreover, even though not all of the specific changes in corporate governance and internal controls have yet been formulated, the company has committed in advance to adopt and adhere to all corporate governance and internal control recommendations made by the Corporate Monitor and the independent consultants, subject only to appeal to this Court. Finally, the com-

pany has agreed to impose all internal controls required by section 404 of the Sarbanes–Oxley Act by no later than June 30, 2004, a full year earlier than the Act requires.

The permanent injunction also requires the company to provide a large segment of its employees with specialized training in accounting principles, public reporting obligations, and business ethics, in accordance with programs being specially developed for the company by New York University and the University of Virginia. At the behest of the Corporate Monitor, the Court also obtained from the new Chief Executive Officer a sworn "Ethics Pledge," requiring, on pain of dismissal, a degree of transparency well beyond S.E.C. requirements. The company has since required its senior management to sign a similar pledge, and has plans to obtain similar pledges from virtually all employees.

The Court is aware of no large company accused of fraud that has so rapidly and so completely divorced itself from the misdeeds of the immediate past and undertaken such extraordinary steps to prevent such misdeeds in the future. While the Court, at the parties' express request, will continue to retain jurisdiction for however long it takes to make certain that these new controls and procedures are fully implemented and secured, the Court is satisfied that the steps already taken have gone a very long way toward making the company a good corporate citizen.

This is not to say that the sins of the past can be forgotten or wholly forgiven. No matter how much the company has transformed itself, no matter how different a company it is now from the company that was used as a vehicle to commit the aforementioned frauds, those frauds were still colossal and must be punished.

The best punishment, unquestionably, is the criminal prosecution of those persons found to have perpetrated the frauds. Such punishment, however, is not within the prerogatives of the Commission (let alone the Court hearing this lawsuit) but rather is the responsibility, in the first instance, of the Department of Justice.

In this lawsuit, the Commission could theoretically seek the effective liquidation of the company. Several of the company's competitors, notably Verizon and AT & T, have urged such an outcome, arguing that it is unfair that, as a result of the bankruptcy laws, WorldCom, the wrongdoer, may emerge from bankruptcy with less of a debt load than that assumed by its competitors. This argument, however, has not commended itself to the Commission, and does not persuade this Court. Corporate reorganization under Chapter 11 of the bankruptcy laws always confers a competitive advantage to the debtor in terms of elimination of debt; yet companies rarely seek bankruptcy except as a last resort, for it involves numerous competitive disadvantages as well, not only in public relations and customer dissatisfaction but in future capacity to borrow and to raise capital. Moreover, whatever advantages in debt reduction WorldCom will realize from bankruptcy reorganization, any suggestion that companies as large and well-positioned as Verizon and AT & T will not be able to compete effectively with the new WorldCom/MCI lacks credence. Verizon, indeed, already enjoys a special competitive advantage of its own by virtue of its status under FCC rules as a *de facto* local monopoly.

To kill the company, by contrast, would unfairly penalize its 50,000 innocent employees, remove a major competitor from a market that involves significant barriers to entry, and set at naught the company's extraordinary efforts to become a model corporate citizen. It would also unfairly impact creditors, over 90 percent of whom

have stated their support for the company's plan of reorganization in recognition that it affords them far more value than liquidation. Finally, it would undercut the basic tenets of bankruptcy reorganization, a unique innovation of United States bankruptcy law that has contributed materially to the conservation of economic resources and the stability of the U.S. economy. Accordingly, the Commission has sought neither outright liquidation nor a monetary penalty so large as to make liquidation inevitable, and the Court sees no reason not to defer to that judgment.

What, then, is the proper monetary penalty? From the Commission's standpoint, it must be one large enough to reflect the magnitude of the fraud and yet not so large as to force the company into liquidation and thereby undercut the Commission's own intensive efforts to reform the company through injunctive relief. The matter is further complicated by the bankruptcy laws and by section 308(a) of the Sarbanes–Oxley Act. Under the bankruptcy laws, the Commission's penalty claim is treated as simply another claim by one of many unsecured creditors, a group that, under the plan of reorganization presently pending before Judge Gonzalez, will generally recover about one-third of every dollar claimed. Under any analysis, moreover, secured creditors have a better legal claim than the Commission to WorldCom's limited assets (estimated, on a liquidation basis, at between four and six billion dollars), so that the kind of multi-billion dollar penalty that might otherwise be worth considering is not even an option except for the purpose (already rejected) of forcing liquidation.

As for section 308(a), while it gives the Commission the opportunity to pay any penalty it recovers to the shareholder victims rather than to the U.S. Treasury, a penalty that was premised primarily on that basis might arguably run afoul of the provisions of the Bankruptcy Code that subordinate shareholder claims below all others. As a general rule, defrauded shareholders can not expect to recover one penny in bankruptcy; and nothing in section 308(a) suggests that Congress intended to give shareholders a greater priority in bankruptcy than they previously enjoyed.

This is not to say, however, that the Commission cannot give its penalty recovery to the shareholders, as section 308(a) so laudably prescribes, or that it cannot take some account of shareholder loss in formulating the size and nature of its penalty: for while the securities laws limit the size of the penalty to the amount that the company has gained from its fraud (an amount here estimated at between ten and seventeen billion dollars), that does not mean that the Commission cannot rationally take account of shareholder loss as a relevant factor in determining the size of the penalty up to that limit. What the Commission may not do, at least in a case in which the company is in bankruptcy, is determine the size of the penalty primarily on the basis of how much shareholder loss will thereby be recompensed, for this would not only be adverse to the priorities established under the bankruptcy laws but also would run contrary to the primary purposes of S.E.C. fraud penalties themselves. *See S.E.C. v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir.1997) (compensation of victims is "a distinctly secondary goal" of S.E.C. actions).

Given all these complications, difficulties, and uncertainties, the Commission has wisely chosen, in formulating a penalty proposal in this case, to look to the penalties it has imposed in prior cases and the factors there considered, *see, e.g., S.E.C. v. Kane*, 2003 WL 1741293 at *4 (S.D.N.Y. Apr.1, 2003) (describing factors commonly considered in making S.E.C. penalty deter-

minations). On that basis, the Commission has negotiated a settlement that results in a penalty dozens of times larger than any it previously imposed against a public company, thereby reflecting the huge size of the instant fraud and the need to deter others similarly situated.

Specifically, in their initially proposed settlement of the monetary penalty, dated May 19, 2003, the parties proposed a penalty of approximately $1.5 billion, which, after the discount in bankruptcy, would result in an actual payment of $500 million, or 50 times the largest such penalty previously imposed. In response, the Court gave all interested parties the opportunity to submit papers in opposition to the proposed settlement, and then conducted a lengthy public hearing on June 11, 2003, so as to air the concerns thus raised.

In particular, the Court took note of the concern that the penalty, despite its substantial size relative to the company's liquidation value, might not adequately take account of the larger value the company was projected to have upon reorganization (somewhere between twelve and fifteen billion dollars). This concern might be mitigated, it was suggested, by modifying the settlement so as to increase somewhat the size of the penalty and make the increase payable in common stock. Such a modification, while avoiding additional cash outlays at a time when the company's cash was limited, would make the total penalty more commensurate with the company's estimated reorganization value. By virtue of section 308(a), a further consequence would be to give the victim shareholders the opportunity to participate, albeit modestly, in any increase in the company's value following its emergence from bankruptcy.

Responsive to these concerns, the parties filed on July 2, 2003 a revised proposed settlement of the monetary penalty aspect of this lawsuit. The revised settlement proposes, first, an overall penalty of $2.25 billion (or more than 40 percent of the mean estimated liquidation value of the company and more than 15 percent of the mean estimated reorganization value of the company). Taking account of the bankruptcy discount, it proposes, second, that if the Bankruptcy Court approves both the settlement and the plan of reorganization, the actual penalty payment will be $750 million—or 75 times greater than any prior such penalty. Third, it proposes that, of the $750 million, $500 million will be paid in cash and the other $250 million in the form of the company's new common stock, as valued in accordance with the plan of reorganization. (If, instead, the company is forced into liquidation, the penalty payment will be limited to the $500 million in cash, since the enhanced reorganization value will not have been realized.) Fourth, it proposes that these payments will be made initially to a Distribution Agent appointed by this Court, who will then undertake to distribute the cash and, at a suitable time, the proceeds of the stock, to the qualifying claimants, as determined by the Distribution Agent and the Court in accordance with guidelines set forth in the Commission's prior submissions and a more detailed plan to be hereafter submitted.

The parties strongly urge approval of the revised settlement as being in the public interest. Before signing the proposed settlement, moreover, the Commission, cognizant that any settlement to be approved by the Bankruptcy Court must also be consistent with the best interests of the creditors, requested and received the signed endorsement of the Official Committee of Unsecured Creditors of World-Com, Inc. (representing the creditors affected by the settlement), who approved the settlement and promised to support it before the Bankruptcy Court. *See* Con-

sent and Undertaking of Defendant World-Com, Inc., dated July 3, 2003, at 10.

A Court reviews such a settlement proposal not on the basis of what it might itself determine is the appropriate penalty but on the basis of whether the settlement is fair, reasonable, and adequate. *See S.E.C. v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991); *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). Moreover, where one of the settling parties is a public agency, its determinations as to why and to what degree the settlement advances the public interest are entitled to substantial deference. *See F.T.C. v. Standard Financial Management Corp.*, 830 F.2d 404, 408 (1st Cir. 1987); *S.E.C. v. Randolph*, 736 F.2d 525, 530 (9th Cir.1984) ("The initial determination whether the consent decree is in the public interest is best left to the S.E.C. and its decision deserves our deference.").

Here, the Court is satisfied that the Commission has carefully reviewed all relevant considerations and has arrived at a penalty that, while taking adequate account of the magnitude of the fraud and the need for punishment and deterrence, fairly and reasonably reflects the realities of this complex situation. Undoubtedly the settlement will be criticized by, among others, those shareholders unfamiliar with the severe limits imposed on their recovery by the bankruptcy laws, those competitors whose own self-interest blinds them to the broader range of public policies that such a settlement implicates, and those professed pundits and ideologues for whom anything less than a corporate death penalty constitutes an "outrage." But the Court is convinced, for the reasons already outlined above, that the proposed settlement is not only fair and reasonable but as good an outcome as anyone could reasonably expect in these difficult circumstances.

Accordingly, the settlement of the monetary penalty phase of this litigation is hereby approved, and the Court will enter today the Final Judgment as to Monetary Relief in the form submitted by the parties.

SO ORDERED.