SOTOMAYOR, Circuit Judge.
Appellant Official Committee of Unsecured Creditors of WorldCom, Inc. (“the Committee”) appeals from an order of the United States District Court for the Southern District of New York (Rakoff, J.) approving a plan by the Securities and Exchange Commission (the “SEC”) to distribute money to the victims of WorldCom, Inc.’s (“WorldCom”) securities fraud. The SEC prepared a distribution plan pursuant to the “Fair Funds for Investors” provision (the “Fair Fund provision”) of the Sarbanes-Oxley Act of 2002 (“Sarbanes-Oxley”), Pub.L. No. 107-204, § 308(a), 116 Stat. 745, 784 (2002) (codified at 15 U.S.C. § 7246(a) (Supp. Ill 2004)), under which the SEC would distribute to defrauded investors the money it collected through the settlement of its civil enforcement action against WorldCom. The Committee, which was not a party to the litigation below, argues that the distribution plan wrongfully excluded certain categories of creditors and that the district court, had it applied the correct standard of review, would have rejected these exclusions. We conclude that the Committee has nonparty standing to appeal the district court’s order, but hold that the district court correctly reviewed the SEC’s plan for fairness and reasonableness and did not abuse its discretion in approving it.
BACKGROUND
On June 25, 2002, WorldCom announced its intention to restate its financial results for all four quarters of 2001 and the first quarter of 2002 because of accounting irregularities. One day later, the SEC filed a civil complaint against WorldCom in the United States District Court for the Southern District of New York pursuant to see *76 tion 17(a) of the Securities Act of 1933 (“Securities Act”), 15 U.S.C. § 77q(a); sections 10(b), 13(a) and 13(b)(2) of the Securities Exchange Act of 1934 (“Exchange Act”), 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2); and regulations promulgated thereunder. It alleged that WorldCom had overstated its income by $9 billion between 1999 and the first quarter of 2002 and in doing so violated various federal securities laws. On July 21, 2002, World-Com filed for bankruptcy under Chapter 11 of the Bankruptcy Code. On July 29, 2002, the United States Trustee appointed the Committee to represent WorldCom’s unsecured creditors, pursuant to 11 U.S.C. § 1102. See In re Worldcom, Inc., No. 02-13533, 2003 WL 23861928, at *1 (Bankr.S.D.N.Y. Oct.31, 2003).
On July 7, 2003, the district court approved a final settlement between World-Com and the SEC under which the company would pay a civil penalty of $750 million.[1] The settlement included a nominal disgorgement of $1, which triggered the Fair Fund provision, 15 U.S.C. § 7246(a), allowing the civil penalty to be added to the disgorgement fund and distributed to defrauded investors. In a written opinion, the district court remarked that the settlement was “not only fair and reasonable but as good an outcome as anyone could reasonably expect in these difficult circumstances.” SEC v. Worldcom, Inc., 273 F.Supp.2d 431, 436 (S.D.N.Y.2003).
WorldCom filed a motion in the bankruptcy court in support of the settlement, and the bankruptcy court approved the settlement on August 6, 2003, noting the Committee’s support. The Committee also supported the settlement in a filing before the district court. Although the SEC sought and received the Committee’s approval of the settlement, the Committee was not formally a party to the proceedings before the district court or a signatory to the settlement. The terms of the settlement provided that the SEC would propose a plan to distribute the funds collected from WorldCom.
On April 15, 2004, after WorldCom emerged from bankruptcy, the SEC sought the district court’s approval of its plan to distribute the funds. Because there was not enough money to compensate all the victims of WorldCom’s fraud, the plan excluded several groups of investors. In particular, it excluded investors who recovered thirty-six cents or more on the dollar under the Chapter 11 reorganization plan or through the sale of their securities, and investors who made a net profit on their combined purchases or sales of WorldCom securities during the period in which the fraud occurred.[2] On July 20, 2004, having found the plan “fair and reasonable,” the district court approved it. SEC v. Worldcom, Inc., No. 02-4963, 2004 WL 1621185, at *1 (S.D.N.Y. July 20, 2004).
Although the district court allowed the Committee to voice its objections to the plan at the fairness hearing, the Committee did not move to intervene in the action below. The Committee now seeks to appeal from the district court’s order approving the distribution plan. It challenges the exclusion of creditors who recovered more than thirty-six cents on the dollar and creditors who made a net profit on the sale of their WorldCom securities.
*77 DISCUSSION
The Committee argues that the district court inappropriately afforded “heightened deference” to the SEC when it approved the distribution plan. Before turning to the merits of this claim, however, we must determine whether we have jurisdiction over this appeal. See Goldberg v. Cablevision Sys. Corp., 261 F.3d 318, 323 (2d Cir.2001).
I. Standing to Appeal
The SEC contends that the Committee may not bring this appeal because it was not a party below and does not meet the requirements to appeal as a nonparty. It also contends that the Committee lacks the authority to appeal because it is acting beyond the powers granted to it by the Bankruptcy Code. We conclude that the Committee has nonparty standing to appeal for the limited purpose of challenging the terms of the distribution plan. We do not reach the question of the Committee’s statutory authority, however, but rather we assume that it is acting within its powers for purposes of this appeal.
A. The Committee’s Right to Appeal as a Nonparty
The SEC argues that the Committee lacks nonparty standing to pursue this appeal because it declined to intervene in the SEC’s action against WorldCom and because it has no interest affected by the district court’s judgment. The SEC further argues that the Committee insufficiently explains which “bondholders” it purports to represent or the precise nature of the financial interest it holds in the Fund. Although the Committee’s failure to describe in detail the effect its challenge would have on the distribution plan has made this a close case with regard to standing, we conclude on the basis of the limited record before us that the Committee has alleged a sufficient affected interest for nonparty standing to attach.
Standing to appeal is an essential component of our appellate jurisdiction. Concerned Citizens of Cohocton Valley, Inc. v. N.Y. Dep’t of Envt’l Conservation, 127 F.3d 201, 204 (2d Cir.1997). The question of nonparty standing to appeal “does not implicate the jurisdiction of the courts under Article III of the Constitution.” Devlin v. Scardelletti, 536 U.S. 1, 6, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002). Rather, the issue is whether an appellant should be treated as a party for purposes of appealing a judgment when it was not a party in the proceedings below. Id. at 7, 122 S.Ct. 2005. The Committee’s Article III standing is uncontested, and we are satisfied, on the basis of the limited record before us, that the constitutional requirements are met: Because the Committee is composed of creditors who suffered economic injuries that are fairly traceable to WorldCom’s violations of the securities laws, and because it seeks financial compensation to redress those losses, the Committee meets the requirements for Article III standing. See Friends of the Earth, Inc. v. Laidlaw Envt’l Servs. (TOC), Inc., 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (discussing the requirements for standing); Watt v. Energy Action Educ. Found., 454 U.S. 151, 161, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981) (recognizing economic injury as an injury-in-fact).
As a general rule, only parties to a lawsuit, whether from the outset or through intervention, may appeal an adverse judgment. Marino v. Ortiz, 484 U.S. 301, 304, 108 S.Ct. 586, 98 L.Ed.2d 629 (1988). The SEC correctly notes that the Committee’s objection to the distribution plan in the district court did not make it a party to the SEC’s civil enforcement action against WorldCom. See New York by Vacco v. Reebok Int'l, Ltd., 96 F.3d 44, *78 47 (2d Cir.1996) (concluding that a district court’s willingness to consider objections concerning the fairness of a proposed settlement did not create standing to appeal). There are, however, two exceptions to the rule prohibiting nonparty appeals. First, as the Supreme Court has recognized, a nonparty may appeal a judgment by which it is bound. See Devlin, 536 U.S. at 10, 122 S.Ct. 2005 (holding that nonnamed members of a class could appeal a settlement that would dispose of their claims). Second, a nonparty may appeal if it has an “interest affected by the ... judgment.” Hispanic Soc’y of the N.Y. City Police Dep’t v. N.Y. City Police Dep’t, 806 F.2d 1147, 1152 (2d Cir.1986), aff'd, sub nom. Marino v. Ortiz, 484 U.S. 301, 108 S.Ct. 586, 98 L.Ed.2d 629 (1988) (“Hispanic Society”). The Committee does not claim that it is bound by the district court’s judgment. Rather, it asserts that it has an interest affected by the judgment sufficient to confer standing to appeal.
We have not required that a nonparty prove that it has an interest affected by the judgment; stating a plausible affected interest has been sufficient. See SEC v. Certain Unknown Purchasers of the Common Stock of and Call Options for the Common Stock of Santa Fe Int’l Corp., 817 F.2d 1018, 1021 n. 1 (2d Cir.1987) (“Santa Fe ”). In Santa Fe, we allowed an investor excluded from a settlement to pursue an appeal because “the district court’s judgment may [have] affeet[ed][his] ability ... to pursue his Rule 10b-5 claims against defendants.” Id. We noted that it was possible, although not certain, that the nonparty’s Rule 10b-5 action would be barred by the settlement, and concluded that “it is sufficient to note that [the non-party appellant] asserts an interest that may be affected by the trial court’s judgment.” Id. Similarly, in Kaplan v. Rand, 192 F.3d 60 (2d Cir.1999), we found that a shareholder had standing to appeal the awarding of attorney’s fees as part of the settlement of a shareholder derivative suit. Id. at 68-69. We observed that although the fees would be paid by an insurance policy, the shareholder had an interest affected by the judgment because the corporation’s insurance premiums could plausibly go up in the future as a result of the payment. Id. at 68.
A nonparty may not appeal, however, when it is clear that it has no interest affected by the judgment. In Hispanic Society, we rejected an appeal by nonparty police officers who objected to the settlement of an employment discrimination suit that, they claimed, harmed their chances for promotion. We noted that the objecting officers had no state-law right to promotion and had not been on the eligible list for promotion before the settlement, and therefore “[e]ven if the settlement were invalidated, ... they would not be entitled to promotion.” Id. We therefore held that they lacked an interest affected by the judgment. Id.
The SEC contends that the Committee has failed to demonstrate even a plausible affected interest because its success on appeal would only reapportion funds among its members and not change its share of the distribution. As the SEC explains it, the pool of funds available for distribution is fixed, and therefore if the Committee successfully challenges the exclusion of certain creditors from the distribution, the result will be to increase the number of creditors sharing limited funds, and thus the funds available to pay the claims of creditors who currently stand to benefit under the distribution plan will be reduced.
It is true that the inclusion of the two groups of creditors might have the effect of redistributing a limited pool of funds among the Committee’s constituents. The *79 Committee, however, also challenges more generally the distribution plan’s favoring of shareholders over creditors and the deference the district court accorded to the SEC in drafting the plan. Given the complexity of the distribution plan and the limited record before us regarding its workings, we are unable to determine how the Committee’s challenge would affect the distribution, and we lack the benefit of an evaluation of this issue by the district court. We therefore cannot conclude, as we could in Hispanic Society, that the Committee’s success on appeal will not affect the amount of money available to creditors (at the expense of shareholders) or otherwise affect the creditors’ interests by requiring greater judicial scrutiny of the SEC’s distribution plan. Without more information, we are reluctant to conclude that the Committee’s asserted affected interest is implausible. We therefore conclude, on the basis of the limited record before us, that the Committee has asserted an interest affected by the judgment sufficient to confer nonparty standing to appeal.[3]
B. The Committee’s Statutory Authority
The SEC argues that the Committee is acting beyond its statutory mandate by initiating proceedings outside the bankruptcy court. We recognize that the Committee is operating at least at the outer edge of its statutory authority. For the reasons that follow, however, we do not consider this the appropriate case in which to determine the scope of creditors’ committees’ statutory authority, a question for which there is little guiding precedent and which was not argued before the district court. Nor do the merits of the Committee’s appeal turn on our resolution of this complicated question.
A creditors’ committee is a creature of statute, deriving its powers and duties from bankruptcy law. Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.), 52 B.R. 879, 883-84 (Bankr.S.D.N.Y.1985) (“In re Johns-Manville”), aff'd 60 B.R. 842 (S.D.N.Y.1986), rev’d on other grounds, 801 F.2d 60, 65, 69 (2d Cir.1986); see also 11 U.S.C. § 1102. The principal source of a creditors’ committee’s powers and duties is 11 U.S.C. § 1103(c), which grants, inter alia, the authority to consult regarding the administration of the bankruptcy case, perform certain investigations of the debtor’s business, participate in the formulation of a bankruptcy plan, request the appointment of a trustee, and “perform such other services as are in the interest of those represented.” 8 U.S.C. § 1103(c)(5). The Committee claims that the present action is authorized by this catch-all provision.[4]
Section 1103(c)(5) does not provide unlimited authorization for legal action by creditors’ committees, however. For example, we have imposed limits on creditors’ committees actions in adversary proceedings in the bankruptcy courts. A creditors’ committee seeking to initiate an adversary proceeding on behalf of the *80 debtor must first seek the approval of the bankruptcy court and demonstrate to the court’s satisfaction that it acts in the interests of the estate. Unsecured Creditors Comm. v. Noyes (In re STN Enters.), 779 F.2d 901, 904 (2d Cir.1985). Similarly, a creditors’ committee may not settle an adversary proceeding over the objections of the debtor-in-possession. See Smart World Techs., LLC, v. Juno Online Servs., Inc. (In re Smart World Techs., LLC), 423 F.3d 166, 184 (2d Cir.2005).
Moreover, in the few cases we have identified in which creditors’ committees have attempted to act entirely outside the bankruptcy proceedings, courts have construed the committees’ authority narrowly. See In re Johns-Manville, 52 B.R. at 884 (“While § 1103 contemplates a committee taking an active role in the reorganization proceedings, it does not grant a committee blanket authority to represent its constituency in matters outside and independent of the bankruptcy case.”). In In re Eagle-Picher Industries, Inc., 167 B.R. 102 (Bankr.S.D.Ohio 1994), a bankruptcy court concluded that an equity committee[5] had exceeded its statutory authority by opposing delisting of the debtor’s stock before the board of directors of the New York Stock Exchange because even if this action were in the interest of the committee’s constituents, § 1103 does not grant committees such extensive authority to represent its constituents in matters beyond the bankruptcy proceedings. Id. at 103-04. In Official Committee of Tort Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), No. 97-1809, 1998 WL 180596 (6th Cir. Apr.6, 1998), the Sixth Circuit, in an unpublished opinion,[6] concluded that legislative lobbying was not among the activities authorized by § 1103(c)(5), even where it would benefit the committee’s constituents. Id. at *4.
There is, in short, a serious question regarding what legal action, if any, the Committee is authorized by statute to pursue outside of the bankruptcy court. We are aware of no cases considering the situation before us, in which a committee seeks to appeal as a nonparty in a proceeding collateral to the proceeding in the bankruptcy court. This knotty question of bankruptcy law has not been fully briefed before us. Moreover, the few cases addressing this question have arisen when committees sought bankruptcy-court approval in advance of taking action outside the bankruptcy proceeding, see In re Dow Corning Corp., 1998 WL 180596, at * 1, sought authorization to continue such an action already in progress, see In re Johns-Manville, 52 B.R. at 884, or requested reimbursement of expenses after the fact, see In re Eagle-Picher Indus., Inc., 167 B.R. at 103. Given that the Committee in this case does not claim that it sought the bankruptcy court’s authorization to initiate this appeal, we think it prudent to allow the bankruptcy court in the first instance to consider the question of the Committee’s statutory authorization in the context of a request for reimbursement of the Committee’s expenses. We express no opinion regarding the Committee’s entitlement to reimbursement, either statutorily or in the bankruptcy court’s discretion.
To the extent that our jurisdiction depends on the Committee’s statutory au *81 thority to bring this appeal, our decision not to reach this question requires us to exercise “hypothetical jurisdiction.” So long as we are satisfied that we have Article III jurisdiction, we have discretion to decline to resolve difficult jurisdictional questions. See Guaylupo-Moya v. Gonzales, 423 F.3d 121, 132 (2d Cir.2005) (“Because the exhaustion requirement raises a question of statutory, rather than constitutional, jurisdiction, we need not resolve [it] in this case and can dispose of [the petitioner’s] argument on its merits.”); Fama v. Comm’r of Corr. Servs., 235 F.3d 804, 816-17 & n. 11 (2d Cir.2000) (assuming that a habeas corpus petition was timely and proceeding to the merits rather than resolve a dispute among the circuits as to timeliness). Because we are satisfied that the Committee has Article III standing and otherwise possesses standing to appeal as a nonparty, we do not resolve the question of the Committee’s statutory authority-
II. The Committee’s Challenges to the Fair Fund Distribution
According to the Committee, the district court extended inappropriate deference to the SEC when it approved the Fair Fund distribution and erred in rejecting the Committee’s objections. We hold that the “fair and reasonable” standard of review applied by the district court is the appropriate one for Fair Fund distribution plans. We also hold that the district court did not abuse its discretion in approving the plan. We begin with a brief background on SEC disgorgement actions and the Fair Fund provision.
A. Disgorgement Funds and Fair Funds
District courts possess broad equitable discretion to craft remedies for violations of the Exchange Act. See SEC v. Fischbach Corp., 133 F.3d 170, 175 (2d Cir.1997). Within this discretion, district courts may require wrongdoers to disgorge fraudulently obtained profits. Id. Although disgorged profits may be distributed to defrauded investors, “[t]he primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains.” Id. Given that compensation of fraud victims is a “secondary goal,” the size of a disgorgement order “need not be tied to the losses suffered by defrauded investors.” Id. at 175-76. Moreover, “it remains within the court’s discretion to determine how and to whom the money will be distributed,” id. at 175, and if the district court determines that no party is entitled to receive the disgorged profits, they will be paid to the United States Treasury (the “Treasury”), see id. at 171, 176.
Finding that disgorgement insufficiently deters securities laws violations because it merely restores the status quo ante, Congress enacted the Securities Enforcement Remedies Act and Penny Stock Reform Act of 1990, 15 U.S.C. § 78u(d)(3) (the “Remedies Act”), to further “ ‘the dual goals of punishment of the individual violator and deterrence of future violations.’ ” SEC v. Coates, 137 F.Supp.2d 413, 428 (S.D.N.Y.2001) (quoting SEC v. Moran, 944 F.Supp. 286, 296 (S.D.N.Y.1996)). As the House Report on the Remedies Act noted,
Disgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud.... The Committee therefore concluded that authority to seek or impose substantial money penalties, in addition to disgorgement of profits, is necessary for the deterrence of securities law violations ....
*82 Id. at 429 (quoting H.R.Rep. No. 101-616 (1990), reprinted in 1990 U.S.C.C.A.N. 1379, 1384-86). The Remedies Act permits the SEC, in addition to seeking disgorgement of ill-gotten profits, to seek civil penalties of generally up to the amount of the gross pecuniary gain from the securities fraud. See 15 U.S.C. § 78u(d)(3)(B).[7]
Prior to Sarbanes-Oxley, civil penalties obtained pursuant to the Remedies Act were paid to the Treasury, and thus were unavailable to injured investors. Thomas L. Hazen, Law of Securities Regulation § 16.2[5] (2006). Sarbanes-Oxley’s Pair Fund provision provides the SEC with flexibility by permitting it to distribute civil penalties among defrauded investors by adding the civil penalties to the disgorgement fund:
If in any judicial or administrative action brought by the [SEC] under the securities laws ... the [SEC] obtains an order requiring disgorgement against any person for a violation of such laws or the rules or regulations thereunder, or such person agrees in settlement of any such action to such disgorgement, and the [SEC] also obtains pursuant to such laws a civil penalty against such person, the amount of such civil penalty shall, on the motion or at the direction of the [SEC], be added to and become part of the disgorgement fund for the benefit of the victims of such violation.
15 U.S.C. § 7246(a). Thus, as with disgorged profits, the SEC may now, if it chooses, use civil penalties that it sought for the purposes of deterrence to compensate injured investors.
B. The Appropriate Standard of Review for Fair Fund Distributions
As the district court noted, the standard of review for Fair Fund distribution plans is a question of first impression, both in this Circuit and elsewhere. The Committee contends that the district court should not have reviewed the Fair Fund distribution plan under the “fair and reasonable” standard for disgorgement plans that we adopted in SEC v. Wang, 944 F.2d 80 (2d Cir.1991), because the goal of Fair Fund distributions is compensation of victims rather than deterrence of future wrongdoing. The district court, it argues, should have “performed an independent review of the proposed plan.” For the reasons that follow, we hold that the same “fair and reasonable” standard of review that applies to the SEC’s distribution of disgorged profits applies to its distribution of civil penalties pursuant to the Fab-Fund provision.
We adopted the “fair and reasonable” standard in Wang in response to a situation substantially similar to the one before us: a creditor’s objection to a plan to distribute disgorged profits that excluded certain claims by options traders. Id. at 85-88. We held that “unless the consent decree specifically provides otherwise[,] once the district court satisfies itself that the distribution of proceeds in a proposed SEC disgorgement plan is fair and reasonable, its review is at an end.” Id. at 85. We explained that the SEC is charged by statute with enforcing the securities laws, and therefore we would defer to its “experience and expertise” in determining how to distribute the funds. Id. at 88. Because “the primary purpose of disgorgement is not to compensate investors, but to ensure that those guilty of securities-fraud are not unjustly enriched,” any subsequent SEC plan to distribute disgorged profits “is reviewed under th[e] court’s general *83 equitable powers to ensure that [the plan] is fair and reasonable.” Id. at 81 (citation omitted). So long as the district court is satisfied that “in the aggregate, the plan is equitable and reasonable,” the SEC may engage in the “kind of line-drawing [that] inevitably leaves out some potential claimants.” Id. at 88.
The Committee argues that a different standard of review is required in the light of the “sea-change wrought by Sarbanes-Oxley.” It contends that the Fair Fund provision substitutes compensation for deterrence as the focus of SEC actions, and thus requires reconsideration of Wang. We do not agree that the Fair Fund provision has worked a sea change in how courts should review SEC distribution plans. For the reasons that follow, we conclude that enactment of the Fair Fund provision has not substantially changed the SEC’s role in determining how to distribute the proceeds of a securities fraud.
First, as we have explained, although the SEC’s purpose in seeking disgorgement of ill-gotten profits has always been deterrence, courts allow it to distribute the proceeds of disgorgement actions as compensation to injured investors. See Fischbach, 133 F.3d at 175; Santa Fe, 817 F.2d at 1021. Deterrence is also the SEC’s goal in seeking civil penalties, see Coates, 137 F.Supp.2d at 429, and the Fan* Fund provision does no more than permit civil penalties subsequently to be distributed in the same way as disgorged profits. The Committee overreads the Fair Fund provision’s mention of “the benefit of the victims” as changing the SEC’s role in distributing funds to injured investors, when instead the language merely empowers the SEC to do with civil penalties what it has long done with disgorged profits. The Fair Fund provision expands the ambit of penalty payments that the SEC has the discretion to distribute. Nothing indicates that the addition of civil penalties to a disgorgement fund changes the SEC’s role in determining how the payments should be distributed.
Second, as the SEC correctly observes, even after the enactment of the Fair Fund provision, the decision remains in the hands of the SEC whether to distribute civil penalties to victims at all. See 15 U.S.C. § 7246(a) (providing that a “civil penalty shall, on the motion or at the direction of the [SEC], be added to and become part of the disgorgement fund” (emphasis added)); Fischbach, 133 F.3d at 176 (noting that proceeds of disgorgement funds need not be distributed to investors). Even if the Fair Fund provision explicitly mentions compensation, the fact that the SEC is not required to distribute Fair Fund proceeds to injured investors belies the Committee’s assertion that the Fair Fund provision makes compensation the primary purpose of the distribution or compels a district court to conduct an independent review of the SEC’s plan. Rather, the Fair Fund provision indicates that the SEC has the same discretion when distributing Fair Fund proceeds that it has when distributing only disgorged profits.
Finally, the Committee invokes administrative-law principles to argue that the SEC is entitled to less deference when it acts outside its area of expertise, citing United States v. Mead Corp., 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and Hampton v. Mow Sun Wong, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), for the proposition that “the level of deference afforded an agency” is tied “to the particular function that it is performing.” The Committee argues that compensation is not within the SEC’s expertise, and thus that the “fair and reasonable” standard of review affords *84 it inappropriate deference. The SEC’s claim to expertise here, however, comes from the fact that it is fulfilling a role assigned to it by statute. We have long understood that the SEC’s charge to enforce the securities laws carries with it the discretion to determine how to distribute recovered profits among injured investors. See Wang, 944 F.2d at 81. The Fair Fund provision merely increases the funds that the SEC may distribute and in no way changes the SEC’s role. We therefore reject the Committee’s contention that the SEC acts outside the scope of its expertise and deserves less deference when it prepares a plan to distribute civil penalties along with disgorged profits.
C. The District Court’s Approval of the Fair Fund Distribution
Having concluded that Wang’s “fair and reasonable” standard of review applies to the district court’s approval of the Fair Fund plan, we also hold that, as in Wang, our review of the district court’s exercise of its equitable powers in approving the plan is for abuse of discretion. See Wang, 944 F.2d at 85 (“Vesting this broad discretionary power in the trial court to craft an equitable decree, as a necessary corollary, narrows the scope of appellate review. Our review therefore is limited to whether the trial court’s order approving or disapproving a settlement was an abuse of its discretion.” (citation omitted)). We conclude that the district court did not abuse its discretion in approving the plan, and thus we reject the Committee’s challenges.
First, the Committee argues that the distribution plan should not have excluded investors whose aggregated sales and purchases of WorldCom securities over the relevant time period resulted in a net profit. In reviewing the Committee’s objection to this exclusion, the district court noted that we upheld a similar distribution provision in Santa Fe that excluded claimants who had not suffered out-of-pocket losses from the defendant’s fraud. We noted that “the equities clearly supported]” the district court’s decision to approve the plan, which reflected the district court’s finding that “the most grievously injured claimants should receive the greatest share of the fund.” Santa Fe, 817 F.2d at 1021. Moreover, we noted that including the investor’s claim would have reduced dramatically the funds available to the other investors. Id. In the present case, too, as the district court observed, “[w]hen funds are limited, hard choices must be made.” It is clear that the SEC considered carefully how best to apportion limited funds among the many injured investors before deciding to exclude this category of investors. Given our approval of the same “hard choice” in Santa Fe, we cannot conclude that the district court abused its discretion in finding this exclusion fair and reasonable.
Second, the Committee objects to the exclusion of creditors who recovered more than thirty-six cents on the dollar either in the bankruptcy proceeding or through the sale of their WorldCom securities. In reviewing the Committee’s objection to this exclusion, the district court observed that “it is fair and reasonable that the limited funds available for distribution not be directed to those who have already recovered more than the approximately thirty-six cents on the dollar recovered by general creditors, and rather be used to increase the still-considerably smaller recovery of those covered by the proposed Distribution Plan.” As the SEC notes, without the exclusion, those creditors who already recovered more than others in the bankruptcy proceeding would also have stood to collect from the Fair Fund, at the expense of those creditors who received less in the *85 bankruptcy proceedings and shareholders who had thus far received nothing.
The Committee argues that this exclusion “flies in the face of the strong public policy that puts the rights of bondholders ahead of those of shareholders.” In the Committee’s view, excluding creditors who already recovered more than general unsecured creditors would “undermine time-honored principles of the Bankruptcy Code, ... a result Congress could not have intended.” See 11 U.S.C. § 510(b). We recognize, as did the district court, Worldcom, Inc., 273 F.Supp.2d at 434, that there is tension between the priority assigned to claims under the Bankruptcy Code and the Fair Fund provision, which empowers the SEC to distribute funds among injured investors outside the bankruptcy proceeding. We see no indication in the Fair Fund provision, however, that the SEC must follow the Bankruptcy Code’s claim priorities when developing a distribution plan. In the absence of such an indication, it is not our role to mitigate this tension.
The district court was required only to determine that the SEC’s distribution plan fairly and reasonably distributed the limited Fair Fund proceeds among the potential claimants. We are satisfied that it did not abuse its discretion in so finding.
CONCLUSION
For the foregoing reasons, the judgment of the district court is Affirmed.

. The district court had earlier granted equitable relief in partial settlement of the SEC’s claims, entering a permanent injunction on November 26, 2002. The Committee does not challenge the injunction.

. The plan excluded other categories of investors, but the Committee challenges only these two exclusions in this appeal.

. We therefore need not decide whether a representative entity like the Committee would have standing to appeal if it sought only to redistribute assets among those it represents.

. The only provision of the Bankruptcy Code explicitly authorizing a creditors' committee to engage in litigation is limited to bankruptcy proceedings. Section 1109(b) provides that "[a] party in interest, including ... a creditors’ committee ... may raise and may appear and be heard on any issue in a case under this chapter.” 11 U.S.C. § 1109(b). The phrase “in a case under this chapter” indicates that § 1109 applies only to bankruptcy proceedings. See Term Loan Holder Comm. v. Ozer Group, LLC (In re Caldor Corp.), 303 F.3d 161, 166-67 (2d Cir.2002).

. Section 1103 governs the powers and duties of equity committees, which represent shareholders, as well as creditors' committees. Id.

. The Sixth Circuit permits citation of unpublished opinions where “an unpublished disposition has precedential value in relation to a material issue in a case, and ... there is no published opinion that would serve as well.” 6th Cir. R. 28(g).

. The maximum civil penalty available for each violation is the greater of a fixed amount determined by the degree of the defendant's wrongdoing or the "gross amount of pecuniary gain." 15 U.S.C. § 78u(d)(3)(B).