Martin v. U.S. S.E.C.

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2012

(Argued: April 11, 2013                    Decided: October 30, 2013)

Docket No. 11-3011

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

ROBERT A. MARTIN, EMPIRE PROGRAMS, INC.,

       *Petitioners*,

          v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

       *Respondent*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Before: KATZMANN, *Chief Judge*, KEARSE, and DRONEY, *Circuit Judges*.

Petitioners challenge an order of the Securities and Exchange Commission authorizing disbursement to the United States Treasury of money remaining in Fair Funds. We deny the petition on the ground that the Petitioners lack Article III standing to mount their challenge to the order.

ALLAN H. CARLIN, Law Office of Allan H. Carlin, New York, New York, *for Petitioners*.

JEFFREY A. BERGER, Senior Counsel (Luis de la Torre, Senior Litigation

Counsel, Jacob H. Stillman, Solicitor, Michael A. Conley, Deputy General Counsel, *on the brief*), Securities and Exchange Commission, Washington, District of Columbia, *for Respondent*.

PER CURIAM:

In 2004, the Securities and Exchange Commission ("SEC") settled an enforcement action against seven firms that executed trading orders on the New York Stock Exchange ("NYSE"). Pursuant to the settlement orders, the SEC placed the money obtained as a result of the enforcement actions into funds for distribution to injured customers. After extensive efforts to identify and compensate injured customers, the SEC ordered that the remaining funds be disbursed to the United States Treasury. Seeking to invoke this Court's statutory jurisdiction under 15 U.S.C. § 78y to review certain orders of the SEC, Petitioners challenge the disbursement order. We deny the petition on the ground that the Petitioners lack Article III standing to mount their challenge to the order.

## BACKGROUND

Empire Programs, Inc., and its president, Robert A. Martin (collectively, "Empire") petition for review of a May 26, 2011 order (the "Order") of the SEC directing the transfer to the United States Treasury of the balance remaining in the distributive funds (the "Fair Funds")[1] that were established in accordance

---

[1] Sarbanes-Oxley's Fair Fund provision permits the SEC to place both disgorgement amounts and civil penalties in a fund for distribution to defrauded investors: "If in any judicial or administrative action brought by the Commission under the securities laws (as such term is defined in section 78c(a)(47) of this title) the Commission obtains an order requiring disgorgement against any person for a violation of such laws or the rules or regulations

with settlement agreements that the SEC entered with Bear Wagner Specialists LLC; Fleet Specialist, Inc.; LaBranche & Co. LLC; Spear, Leeds & Kellogg Specialists LLC; Van der Moolen Specialists USA, LLC; Performance Specialist Group LLC; and SIG Specialists, Inc. (collectively, the "Specialist Firms"). Empire asserts that the Order: (1) violates Section 308(a) of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7246(a), regarding the use of civil penalties for the benefit of injured investors; (2) contradicts the terms of the settlement agreements; and (3) is barred by SEC Rule 1102(b), 17 C.F.R. § 201.1102(b).

During the relevant time period, each security on the NYSE was assigned to one of the Specialist Firms. Specialist Firms could trade in their assigned securities as either agents or principals. When acting as an agent, a Specialist Firm would facilitate transactions by investors. To purchase or sell a security, investors were required to present their order to that security's Specialist Firm. The Specialist Firm would then use a computerized "display book" listing investors' orders to execute transactions. Specialist Firms were required to quote prices that accurately reflected the prevailing market conditions. When acting as an agent, Specialist Firms were required to match the orders of buyers and sellers, and thus ensure the execution of trades at the best available price. Specialist Firms could also act as a principal, trading on their own accounts, but only when it was necessary to maintain a fair and orderly market. *See In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 92 (2d Cir. 2007).

---

thereunder, or such person agrees in settlement of any such action to such disgorgement, and the Commission also obtains pursuant to such laws a civil penalty against such person, the amount of such civil penalty shall, on the motion or at the direction of the Commission, be added to and become part of the disgorgement fund for the benefit of the victims of such violation." 15 U.S.C. § 7246(a) (2002). This provision was amended by the Dodd-Frank Act in a manner not relevant here.

3

# I. SEC Enforcement Actions and Settlements

In 2004, the SEC alleged that the Specialist Firms had used two manipulative tactics: "interpositioning" and "trading ahead." Both interpositioning and trading ahead involve a Specialist Firm trading as a principal even though such trading is unnecessary to maintain a fair and orderly market because there are customers who are prepared to trade with each other. "Interpositioning" refers to the practice of capturing the spread between a buy order and sell order. For example, if one customer has placed an order indicating her willingness to sell a security for $20.00, and another customer has placed an order indicating his willingness to buy the security for $20.01, the Specialist Firm should see both orders on the display book for the security and match them, allowing the former customer to sell to the latter at a price of either $20.00 or $20.01. The Specialist Firm could engage in "interpositioning" by purchasing the security for its own account for $20.00 from the former customer and selling the security from its own account to the latter customer for $20.01. By standing between the two customers, the Specialist Firm would reap a $0.01 profit on the trade.

"Trading ahead" refers to the practice of executing proprietary trades ahead of the trades ordered by customers. For example, the Specialist Firm might use its unique access to customers' orders to determine whether the price of a security is trending up or down. If the Specialist Firm found that the price of the security would fall, the Specialist Firm could use this knowledge to reap a profit by "trading ahead" of the sell orders. It would do this by failing to match the buy and sell orders in the display book, and instead satisfying the buy orders by selling the security out of the Specialist Firm's own inventory. The Specialist Firm would then wait for the security's price to fall before replenishing its

4

inventory by satisfying the sell orders. This would allow the Specialist Firm to transfer the negative impact of the decline from itself to the customers who had sought to sell. Similarly, if the Specialist Firm found that the price of the security would rise, it could "trade ahead" of the customers who had sought to buy by purchasing for its own account, waiting for the price increase, then satisfying the customer buy orders by selling from its own inventory. This would allow the Specialist Firm to capture a price increase that would otherwise accrue to the customers who had sought to buy.

The SEC alleged that the Specialist Firms had engaged in unlawful interpositioning or trading ahead in a specific set of trades. In order to identify these trades, the SEC used an algorithm that identified situations in which a Specialist Firm had traded for its own account even though a buy order and a matching sell order appeared on the display book. However, the SEC recognized that its algorithm could generate false positives. A system error or a delay could prevent a Specialist Firm from recognizing the match, or the Specialist Firm might have orally executed the trade involving the matching orders. In order to screen out false positives to match orders, the SEC excluded instances in which the orders appeared on the display book for less than ten seconds.

The trades in which matching orders sat unexecuted for ten seconds or more (the "Covered Transactions") were subject to the SEC's enforcement action against the Specialist Firms. In the aggregate, these 2.661 million transactions resulted in profits to the Specialist Firms of $157.8 million. Through settlements with the SEC in March and July of 2004 (the "Settlement Orders"), the Specialist Firms agreed to disgorge these $157.8 million in profits, and to pay additional civil penalties of $89.4 million. The Settlement Orders also provided that the disgorgement and civil penalties would be deposited in Fair Funds for distribution according to a plan drawn up by an administrator. Each Settlement

Order provided that the Fair Fund it created would be used "(i) to pay for the costs of administering the [distribution plan]; (ii) to reimburse injured customers for their loss; and (iii) pay prejudgment interest to injured customers. The [SEC] shall determine the appropriate use for the benefit of investors of any funds left in the Distribution Fund following such payments. Under no circumstances shall any part of the [Fair Fund] be returned to [the Specialist Firms]."

The SEC established the Fair Funds in October of 2004, and appointed the firm of Heffler, Radetich & Saitta L.L.P. ("Heffler") as administrator. In order to distribute funds to the injured customers, Heffler began tracing the Covered Transactions by working with clearing firms. Clearing firms process the final stages of a securities transaction, including delivery. In many instances, the clearing firm could only identify the brokers involved in a transaction, and many of the brokers involved had either destroyed their records or ceased to exist. At the end of this process, Heffler was able to match customers for 77.6% of the Covered Transactions. $159.8 million remained in the Fair Funds because Heffler was unable to match a customer to the remaining 22.4% of the Covered Transactions, and because many of the customers identified either could not be located or failed to cash checks mailed to them.

Empire Programs, Inc. was identified as a customer in certain Covered Transactions, and has received a distribution compensating it for losses it suffered in connection with those transactions.

## II. Private Class Action

On October 17, 2003, several private parties including Empire filed class actions against the Specialist Firms. These class actions included similar allegations of interpositioning and trading ahead, but on a different set of trades.

The suits were ultimately consolidated in the United States District Court for the Southern District of New York. *In re NYSE Specialists Sec. Litig.*, 503 F.3d at 95. The defendant Specialist Firms resisted the private litigation by arguing that the relief sought was already covered by the disgorgements obtained by the SEC. The district court rejected this argument, holding that "although the Amended Complaint" in the private action "alleges the same wrongdoing on the part of the Specialist Firms as that alleged in the SEC investigation, the instant suit is not duplicative because . . . it only provides for relief for those violative transactions not yet" covered by the SEC enforcement action. *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 81 (S.D.N.Y. 2009). The private litigants planned to identify these additional trades by modifying the computer algorithm used by the SEC. For example, the SEC action only addressed Specialist Firm trades for which matching buy and sell orders had appeared on the display book for at least ten seconds. The private plaintiffs' suit addressed trades for which buy and sell orders appeared for a period between one and ten seconds. *Id.* at 67.

**III.    SEC Decision to Transfer Remaining Funds to the U.S. Treasury**

Once Heffler's efforts to disburse the funds had concluded, the SEC solicited public comments on the disposition of the remaining funds. After considering the comments, the SEC entered the Order, which directed the transfer of the remaining funds to the United States Treasury. In reaching this decision, the SEC rejected Empire's contention that Heffler had failed to identify injured customers through "indifference or incompetence (or some other unknown reason)." The SEC concluded that Heffler had "engaged in a painstaking process to identify, and distribute disgorgement to, harmed investors," and "that further efforts to identify previously unidentified investors

whose transactions were the subject of the settlement orders would not be reasonable or appropriate under the circumstances here. . . . [F]urther efforts are unlikely to be fruitful."

The SEC also rejected various alternatives. The first option, supported by Empire and the Specialist Firms, was to disburse the remaining funds to the plaintiffs in the private class action. The SEC concluded that this would be unwise because it would indirectly reduce the Specialist Firms' liability: "If the undistributed funds were used to settle related litigations . . . Defendants would benefit from not having to pay those settlements with their own money." The SEC also rejected Empire's argument that "the remaining funds [should] be used to compensate investors who were injured in transactions not covered by the settlements," observing that "[h]ad the [SEC] included other transactions as part of the settlements, the terms of the settlements would have been different."

Empire also endorsed a second option, distributing the remaining funds *pro rata* to the previously identified (and previously reimbursed) injured customers. Empire supported this option by observing that there was no assurance that Empire had "received reimbursement anywhere near 100% of its actual losses." The SEC rejected this argument. Empire had been fully compensated for every Covered Transaction for which it was identified as the injured customer. The SEC acknowledged that "it is possible that some customers who were fully compensated for their losses with respect to a particular transaction may have also suffered a loss with respect to another transaction that was part of the settlement, but where, for one reason or another, the customer could not be identified as linked to the loss." But the SEC responded that "there is no requirement that a plan administrator compensate any person for losses that cannot be substantiated. Indeed, Empire points to nothing more than supposition to support its assertion that neither it nor any

8

other identified investor has received 100% of losses from transactions covered by the settlements." The SEC thus concluded that a *pro rata* distribution would amount to an undeserved windfall to the previously identified customers. Accordingly, the SEC decided to distribute the remaining funds to the U.S. Treasury.

**DISCUSSION**

We find that Empire has failed to plead an injury in fact sufficient to afford it Article III standing. Consequently, we dismiss the petition for lack of subject matter jurisdiction and decline to reach the merits of Empire's claims, except to the extent that the merits overlap with the jurisdictional question. Article III standing enforces the Constitution's case-or-controversy requirement. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also* U.S. Const. art. III, § 2. To establish standing pursuant to Article III, "the plaintiff must have suffered an injury in fact – an invasion of *a legally protected interest* which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (emphasis added) (citations, footnote, and internal quotation marks omitted). Significantly, when a "plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Id.* at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). Empire's asserted injuries cannot satisfy these standards. Instead, Empire's injuries fall into one of three categories: fully compensated, conjectural, or based on alleged violations not covered by the settlements.

The settlement agreements with the Specialist Firms only address Covered Transactions. *See* Petitioner's Br. at 37 ("The Settlement Orders . . . were . . .

9

predicated on the proposition that the SEC and NYSE had identified specific Violative Transactions in which customers were disadvantaged by improper proprietary trading by the Specialist Firms, and had calculated the amount of customer losses attributable to the Violative Transactions.").[2] For every Covered Transaction in which Empire was identified as the injured customer, Empire has already received a distribution from the Fair Funds that fully compensated it for that Covered Transaction.

Admittedly, there were a substantial number of Covered Transactions for which it was not possible to identify the injured customer. It is possible that Empire was the injured customer in some of those transactions, but only possible: Empire has not identified any such injury, nor has it suggested a method for making such identifications. This type of hypothetical or conjectural injury is not sufficient to confer standing. *See Lujan*, 504 U.S. at 560.

The only remaining "injury" that Empire seeks to redress is harm caused by transactions that were not contemplated by the settlement agreements. Empire cannot assert a legal claim to the remaining assets in the Fair Funds based on these transactions. Empire has brought a private law suit against the Specialist Firms to pursue monetary relief for any injuries caused by non-covered transactions. But any injuries that Empire might have suffered in *non-covered transactions* do not give it an interest in the remaining funds from a settlement based on *Covered Transactions*.

This Court's decision in *Official Committee of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73 (2d Cir. 2006) ("*Official Committee*"), does not compel a different result. *Official Committee* considered part of the fallout from

---

[2] In its reply brief, Empire suggests that the SEC did not intend for the Settlement Agreement to cover only a certain set of transactions. This assertion is not only incorrect, but inconsistent with statements in Empire's opening brief and with its position before the district court in the private class action against the Specialist Firms.

WorldCom's massive accounting fraud and its subsequent bankruptcy. In the wake of the accounting fraud, the SEC brought suit against WorldCom. The SEC subsequently sought and obtained approval of a monetary settlement from the United States District Court for the Southern District of New York. *See SEC v. WorldCom, Inc.*, 273 F. Supp. 2d 431 (S.D.N.Y. 2003). The SEC set aside the money in a fair fund. After WorldCom emerged from bankruptcy under Chapter 11 of the Bankruptcy Code, the SEC sought to distribute the fair fund pursuant to a distribution plan that excluded certain investors.

In *Official Committee*, this Court approved the SEC's decision to exclude those investors from the fair fund distributions despite objections by the Official Committee of Unsecured Creditors from the bankruptcy proceedings. 467 F.3d at 84-85. Prior to reaching a review of the district court's approval of the distribution plan, we paused to analyze the Official Committee's ability to bring its challenge in court. In the context of a discussion focused on the Official Committee's nonparty standing to appeal from a district court judgment, we briefly observed that the Official "Committee's Article III standing is uncontested, and we are satisfied, on the basis of the limited record before us, that the constitutional requirements are met: Because the Committee is composed of creditors who suffered economic injuries that are fairly traceable to WorldCom's violations of the securities laws, and because it seeks financial compensation to redress those losses, the Committee meets the requirements for Article III standing." *Id.* at 77.[3] However, unlike the situation in *Official Committee*, to the extent that Empire has suffered substantiated economic injuries

---

[3] The SEC contends that injured investors *never* have "Article III standing to challenge Commission orders regarding the disposition of Fair Fund money." Respondent's Br. at 30. As the SEC itself acknowledges, we need not address this argument in order to resolve this case.

that are fairly traceable to the securities law violations that gave rise to the Settlement Orders, those economic injuries have already been fully redressed.

**CONCLUSION**

For the foregoing reasons, the petition for review is hereby DISMISSED.